IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

|   |   |
|---|---|
| TIMOTHY C. WATSON,<br><br>       Plaintiff,<br><br>vs.<br><br>DYERSBURG CITY POLICE<br>DEPARTMENT, et al.,<br><br>       Defendants. | No. 08-2718-SHM-tmp |

---

FINDINGS OF FACT AND CONCLUSIONS OF LAW
VERDICT FOR DEFENDANTS
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
ORDER DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

---

A bench trial was held on December 17, 2012, and December 18, 2012, on Plaintiff Timothy C. Watson's § 1983 claims of excessive force against Officers Christopher Clements and Russell Burrow. For the reasons stated below, a verdict will be entered for Defendants on Plaintiff's claims.

I.       **BACKGROUND**

   **A.   Procedural History**

   On October 15, 2008, Plaintiff Timothy C. Watson, Tennessee Department of Correction prisoner number 221443, who is currently an inmate at the Hardeman County Correctional Facility in Whiteville, Tennessee, filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 against the City of Dyersburg, Tennessee, and Dyersburg Police Officers Mason (Joe) McDowell, Christopher

Clements (whose last name was misspelled as "Clemmons" in the Complaint), Russell Burrow, and Sterlin Wright. (Docket Entry ("D.E.") 1.) The complaint alleged, *inter alia*, that Dyersburg Police officers used excessive force while arresting Plaintiff on October 13, 2007, and February 20, 2008. Plaintiff filed an amendment to his complaint on November 4, 2008. (D.E. 3.) On April 28, 2009, the Court issued an order that, *inter alia*, granted leave to proceed *in forma pauperis* and assessed the civil filing fee, granted in part and denied in part leave to amend, denied appointment of counsel, and directed the Clerk to issue process for, and the marshal to effect service on, the Defendants. (D.E. 6.) Defendants filed an Answer on July 8, 2009. (D.E. 20.)

On November 24, 2010, Defendants filed a motion for summary judgment. (D.E. 87.) Plaintiff filed a response to the summary judgment motion on April 4, 2011 (D.E. 117 & 118), and Defendants filed a reply on April 21, 2011 (D.E. 122). On May 16, 2011, Plaintiff filed a document entitled Plaintiff Request Leave (Permission) to Reply And Amend Plaintiff's Response to Defendants Summary Judgment. (D.E. 124.) Defendants filed a reply in opposition to the motion on May 31, 2011. (D.E. 125.) In an order issued on July 8, 2011, the Court granted Plaintiff's motion for leave to file a sur-reply and to amend his response to the summary judgment motion, granted Defendants' motion to dismiss Plaintiff's claims arising from the October 13, 2007 arrest as time barred (which included all claims against McDonald and Wright), granted summary judgment on Plaintiff's claims against the City of

Dyersburg, denied the motion to dismiss Plaintiff's claims against the individual defendants in their individual capacities, dismissed the false arrest claim arising from the arrest on February 20, 2008, denied summary judgment on the excessive force claim arising from the arrest on February 20, 2008, and denied summary judgment on the basis of qualified immunity. (D.E. 137.) The only remaining claims were those against Defendants Burrow and Clements arising from the alleged used of excessive force on February 20, 2008. (Id. at 27-28.)

Defendants Burrow and Clements appealed the denial of qualified immunity on the February 20, 2008 arrest, and Plaintiff filed a cross-appeal. (D.E. 138 & 141.) In an order issued on September 29, 2011, the Sixth Circuit Court of Appeals dismissed Plaintiff's appeal because it was taken from a non-final order. Watson v. City of Dyersburg, Nos. 11-5842 & 11-5920 (6th Cir. Sept. 29, 2011). On May 23, 2012, the Court of Appeals affirmed the Court's denial of qualified immunity to Defendants Burrow and Clements. Watson v. City of Dyersburg, No. 11-5842 (6th Cir. May 23, 2012). The mandate issued on June 20, 2012. (D.E. 149.)

A bench trial was set for December 17, 2012. (D.E. 155.) On December 7, 2012, Defendants Burrow and Clements filed their Trial Brief. (D.E. 164.) The Pre-Trial Order was entered on December 17, 2012. (D.E. 176.) The case was tried on December 17, 2012, and December 18, 2012. (D.E. 177 & 178.) On January 16, 2013, Defendants Burrow and Clements filed their Proposed Findings of Fact and Conclusions of Law. (D.E. 180.) Plaintiff filed his

Proposed Findings of Fact and Conclusions of Law on June 7, 2013. (D.E. 185.)

**B.    Proof at Trial**

At the bench trial on December 17, 2012 and December 18, 2012, Plaintiff called Defendant Burrow in his case in chief. Russell Burrow was employed by the Dyersburg Police Department ("DPD") at the time of trial and on February 20, 2008. (Tr. 18.)[1] On February 20, 2008, Burrow was "on patrol" (<u>id.</u>) and was "a K9" officer (<u>id.</u> at 19).

Burrow testified that, on February 20, 2008, he and Officer Clement initiated a traffic stop of Watson because "[w]e observed [him] driving a — operating a motor vehicle and knew [his] license to be revoked." (<u>Id.</u>) Burrow knew Watson's license was revoked because "I had checked it probably a week prior." (<u>Id.</u>) Burrow had "no idea" how long it took to get a license reinstated, and he did not run Watson's license immediately before initiating the stop. (<u>Id.</u>) Burrow explained that "[w]e didn't have time." (<u>Id.</u>) Watson was stopped on reasonable suspicion of driving on a suspended or revoked driver's license. (<u>Id.</u> at 19-20.)

Burrow was asked when he ran Watson's license, and he responded, "It was probably around a week before. I saw [him] operating the same vehicle." (<u>Id.</u> at 20.) Burrow could not recall why he did not stop Watson immediately after running his license, and he testified, "I couldn't tell you that. I might have been

---

[1]    References to the trial transcript, which is found at D.E. 186 and 187, are designated as "Tr. __" or by the name of the witness, *e.g.*, "Burrow __."

doing something else, on the way to a call. I don't remember."
(Id.) Burrow denied having any personal, hard feelings toward
Watson. (Id. at 20-21.)

Burrow recalled that there was a small child in Watson's
vehicle on February 20, 2008. (Id. at 21.) Burrow testified that he
had no knowledge that Watson had previously been shot. (Id.) Burrow
did not believe there was a dash camera in the police cruiser.
(Id.)

Watson was not the target of an ongoing investigation. (Id.)
In response to why he took the initiative to run Watson's license,
Burrow testified, "I saw [him] operating a motor vehicle. I've did
that to a lot of people, check their licenses that I believe to be
revoked." (Id.) Burrow denied that he randomly ran the licenses of
motorists, stating that he only investigated "[p]eople that I . . .
have knowledge or suspect to be revoked." (Id. at 22.) Usually,
after confirming that a motorist's license has been suspended or
revoked, Burrow initiates a traffic stop "unless I'm doing
something else." (Id.)

Burrow ran Watson's license again on February 20, 2008, after
Watson had been taken into custody. (Id.) Burrow reiterated that he
had reasonable suspicion to stop the vehicle "based on the prior
week." (Id.; see also id. at 23.)

Once Watson's vehicle had stopped, Officer Burrow did not
immediately get out of the cruiser and approach the vehicle. (Id.
at 23.) He remained in his cruiser while "[g]iving our location and
status to dispatch, calling out the stop." (Id.) Once that had been

completed, Burrow exited his cruiser. (<u>Id.</u>) Burrow testified that, "[a]fter I called dispatch, I saw [Watson] moving around quite a bit in the vehicle; and Officer [Clements] was yelling orders to [him]. I came to his location." (<u>Id.</u>)[2] Clements was on the driver's side of Watson's truck. (<u>Id.</u>) Clements told Burrow "that [Watson] had marijuana in [his] mouth, said [he] had weed in [his] mouth, and he was trying to remove [Watson] from the vehicle." (<u>Id.</u>) Burrow could not recall whether the door was locked. (<u>Id.</u> at 23-24.) He believed that the window "may have been partially down." (<u>Id.</u> at 24.) The driver's side door was open, and Clements was attempting to pull Watson out of the vehicle and was "[g]iving [him] orders to exit the vehicle. Spit it out." (<u>Id.</u>) Once [Watson] exited the vehicle, the officers "attempted to take [him] into custody, to get [him] on the ground and get [him] handcuffed." (<u>Id.</u>) Burrow did not recall Watson raising his hands and stating, "I'm not resisting." (<u>Id.</u>) He also did not hear Watson ask Clements not to spray inside the vehicle because a small child was present. (<u>Id.</u>)

Burrow testified that Clements had to physically pull Watson out of the vehicle. (<u>Id.</u> at 24-25.) Watson was standing after being pulled out of his truck. (<u>Id.</u> at 25.) The officers "tried to get [him] handcuffed, and [he] stiffened up and was thrashing around. Wouldn't let us get [him] handcuffed. [He] wouldn't obey our orders to stop resisting. [He] wouldn't allow us to handcuff [him]." (<u>Id.</u>)

---

[2]	The trial transcript consistently misspells Officer Clements' last name as "Clemmons."

At that point, Burrow "sprayed [Watson] with Freeze per policy" while [Watson] was standing up and "refusing orders." (Id.)

The burst of Freeze "helped get [Watson] on the ground." (Id.) The officers were still unable to handcuff [Watson] because he "continued to resist and thrash around." (Id.) Burrow did not recall his physical position, but stated that "I guess I was behind [Watson]." (Id.) Burrow recalled that Watson was facedown and thrashing around. (Id. at 26-27.) Burrow testified that he did not recall being on Watson's back. (Id. at 27.) Burrow was behind Watson, meaning that "I would have been trying to get [his] arms behind [his] back. So, I would have been behind [Watson], trying to pull [his] arms back to get [him] handcuffed." (Id.) Burrow did not recall specifically where Clements was at that time, but Burrow remembered that Clements was assisting in securing Watson. (Id.) Because the officers were unable to handcuff Watson, Officer Clements sprayed him. (Id.) At that point, Burrow testified that Watson "spit out a bag of marijuana, and [he] allowed us to handcuff [him]. At that point [he] stopped resisting." (Id.) Burrow denied that Watson was sprayed again after he was handcuffed. He testified, "You were only sprayed twice, once by me and once by Officer [Clements]." (Id.)

Burrow testified that he believed his conduct during the stop was objectively reasonable. (Id. at 27-28.) Burrow acknowledged that there had been no high-speed chase and that Watson did not attempt to flee. (Id. at 28.) He acknowledged that "[y]ou were sitting in the vehicle. You didn't try to run." (Id.) Burrow

testified that he did not have any type of combat training, although he had the training in "defense tactics" that was required by the police department. (Id. at 29.) The training in defense tactics includes "just takedowns like arm bars. We do have some pressure points." (Id.) The training does not include "grapplings." (Id.) Burrow reiterated that he had no prior knowledge that Watson had been shot. (Id.)

Burrow was asked whether a simple possession of marijuana charge warranted the amount of force that was used, and he responded, "If you would have complied, it's possible you could have got a misdemeanor citation; but you failed to comply with our orders and resisted." (Id. at 30.) Burrow did not attempt to obtain a video from the store where the incident occurred. He stated that "I don't even know if they have video." (Id.) Burrow disagreed that Watson had pulled over once the officers activated their blue lights. He testified that Watson had already parked before the lights were activated. "You had pulled into the parking lot of that store when we turned around. Then we pulled in behind you and turned our lights on, letting you know you're being detained, that you couldn't leave." (Id.) Burrow did not recall that Watson stated he was not resisting or holding his hands up in submission. (Id. at 30-31.)

Burrow testified that Watson was the only citizen who ever filed a complaint against him. (Id. at 31.) Watson's complaint was filed before the arrest at issue. (Id.) Exhibit 1, an Employee Complaint Report against Burrow, dated August 8, 2007, was admitted

to show the motivation for Burrow's actions on February 20, 2008. (Trial Tr. 31-33.)[3] Burrow denied that he was following too closely. He testified that "I don't recall getting right next to [Watson] and following [him]. I was sitting in the store in the parking lot, over beside it just like I usually do. I've done it on many occasions." (Id. at 34.) Burrow testified that he pulled out of the gas station at the same time as the car in which Watson was riding and proceeded "probably five or six car lengths behind [him]. [Watson] went up the bypass. I went back north on the bypass." (Id. at 35.) Burrow testified that it was coincidental that he and Watson were traveling in the same direction. (Id.)

Burrow testified that he had prior knowledge of criminal activity by Watson because he "had two prior encounters with" him. (Id. at 38.) The first occurred in 2004, when Burrow arrested Watson in response to "a call that a black male and black female had passed a counterfeit 100-dollar bill at a local business." (Id.) Burrow recalled that "I believe I had charged you with possession of marijuana, criminal simulation, criminal impersonation, and evading arrest. I believe you — it went to a jury trial and you were found guilty of the possession of

<hr />

[3]     The citizen complaint states that, "[o]n 8-7-07 Rusty Burrows [sic] seen me at Dodgers pumping gas[. B]efore I could get off the lot he was right on the rear bumper of my friends car[. W]e were afraid [sic] for our safety we thought he was gonna run us off the road he was so close. About 2 wks ago he arrested me and told me that: I told you I was gonna get you. Back in 2005 he arrested me and I went to trial and was acquitted and he told me then that he was gonna get me. . . ." (Ex. 1 at 1-2.) The Chief of Police checked a box labeled "No Further Action Required." (Id. at 2.)

marijuana." (<u>Id.</u> at 39.) The remaining charges were either dismissed or Watson was acquitted. (<u>Id.</u>)

The second incident, which occurred in 2007, involved a traffic stop. (<u>Id.</u>) Burrow testified that "I issued you a citation for registration law which was the initial reason for the stop and you had no insurance and then I would up searching the vehicle. I utilized my K9. Gave a positive response for narcotic odor, and I wound up searching the vehicle." (<u>Id.</u>) Burrow "found residue, marijuana residue and loose tobacco which is common with smoking a blunt." (<u>Id.</u>) Burrow did not charge Watson with possession of marijuana. (<u>Id.</u> at 40.) Watson was charged with theft of property because he "had a stolen weapon under the driver's seat beneath [him]." (<u>Id.</u>) Burrow did not recall the disposition of the charge. He stated that "I believe you were charged with felon in possession . . . ." (<u>Id.</u>)

Burrow testified that he did not take Watson's acquittal on the 2004 criminal simulation charge personally. (<u>Id.</u> at 41.) Burrow denied telling Watson after his acquittal that he was going to get him. (<u>Id.</u> at 41-42.) Burrow did not recognize Watson before he initiated the stop in 2007. (<u>Id.</u> at 42.) In response to why he ran the tags on that vehicle, Burrow testified that "I had seen that vehicle probably a week or two earlier at your mother's house." (<u>Id.</u>) He stated that "[i]t was parked behind the residence like it was being hid." (<u>Id.</u>) Burrow was in the area because "[a]t that time we had warrants on one of your relatives, felony warrants."

(Id.) When Burrow ran the tags, "[i]t came back to a different vehicle." (Id. at 43.)[4]

Burrow denied that he takes his job personally. (Id. at 44.) He denied that he had "any harsh feelings" because he arrested Watson on two separate occasions and, on each occasion, Watson was acquitted or the charges were dismissed. (Id. at 45.) Burrow testified that "[t]hat's part of my job. I don't take it personal." (Id.)

After Watson filed a "formal complaint" about Burrow, his superior officers did not instruct him to stay away from Watson or to leave him alone. (Id.) Burrow does not recall discussing Watson's citizen complaint with Clements or any other officer. (Id.)

Christopher Clements testified that, at the time of trial, he was employed by the DPD, where he had worked for the previous twelve years. (Id. at 47.) At the time of trial, Clements was a narcotics officer. (Id.) He denied that he was racist. (Id.)

Clements testified that he and Officer Burrow decided to initiate the traffic stop on February 20, 2008. (Id. at 49.) Clements testified as follows:

> We pulled behind your vehicle at T&B parking lot.
>
> I approached the vehicle while Officer Burrow called in the stop; and while I was approaching, I could see you pull something out of the console and stick it in your mouth.

---

[4] It is unclear whether Burrow ran the tag on the day of the 2007 stop or the previous week, when he saw the vehicle at Watson's mother's house. He testified that "[i]t's based on the way it was parked, like it was being hid." (Id.)

> And I got a little closer and you had this look of concentration on your face and you were chewing.
>
> While you were chewing, I could see glimpses of a green, leafy substance I believed to be marijuana and a plastic baggie in your mouth.
>
> I immediately started telling you to spit it out.

(<u>Id.</u> at 49.) Clements did not recall that the windows were tinted. He testified that the window "was halfway down." (<u>Id.</u>) In response to whether Plaintiff was chewing with his mouth open, Clements replied, "You were chomping, you know. Like I couldn't see every detail inside, but you were trying to chew as much as you could. So, I could see the marijuana in your mouth and the plastic bag." (<u>Id.</u> at 49-50.) Clements observed the drugs while "[s]tanding in front of you, kind of like an angle" from "about where the mirror was at." (<u>Id.</u> at 50.) At that time, Clements "had already opened up the doors, telling [Watson] to spit it out." (<u>Id.</u>) Clements recalled that a little girl was in the front passenger seat of the vehicle. (<u>Id.</u> at 50-51.)

Clements denied brandishing his Freeze at Watson before he got out of the vehicle. (<u>Id.</u> at 51.) He stated that

> I was just trying to — I kept on ordering you to spit it out. Spit it out. You kept on chewing on it. Had this look of concentration.
>
> Told you to get out of the vehicle. You refused.
>
> Then I attempted to pull you from the vehicle. You was holding onto the seat.

(<u>Id.</u>) Clements reiterated that he never drew his Freeze, explaining that "[w]e couldn't 'cause there was a small child in there." (<u>Id.</u>) Clements denied that Watson asked him not to spray because there

12

was a child in the vehicle. He testified that Watson did not say anything until after he was handcuffed. (Id.)

In response to whether he had combat training or martial arts training, Clements testified that "[w]e just do defense tactics, police defense tactics." (Id.) Clements received the same training Burrow received. (Id. at 51-52.) At the time of Watson's arrest on February 20, 2008, Clements was not aware that Watson had previously been shot multiple times. (Id.)

Clements testified that he had to physically remove Watson from his truck after he would not comply with verbal instructions. (Id.) Clements was able to physically remove Watson from the truck "[a]fter two attempts." (Id.) He testified that "I grabbed your arm, trying to pull you from [the vehicle]." (Id.) Clements used the same technique a second time, which was successful. (Id. at 52-53.) He testified: "But you were still standing on your feet and I was still ordering you to spit it out, put your hands behind your back, and you would not comply." (Id. at 53.) Clements denied that Watson raised his hands and stated that he was not resisting. (Id.) On further questioning, Clements testified that he partially removed Watson from the truck and, when there was room, Burrow assisted in getting him entirely out of the truck. (Id. at 55-56.)

During that time, Clements kept holding onto Watson's arm. (Id. at 53.) Clements recalled that Burrow was holding onto Watson's other arm or attempting to do so. (Id.) According to Clements, "You were pulling your arms away. We could not get control over you." (Id.) Clements elaborated: "We were attempting

13

to grab an arm. You know, we would lose it certain times when you were pulling away; and then you was still also chewing your dope and trying to swallow it." (<u>Id.</u> at 54.) Clements recalled that "[i]t was a fight. You were pulling away." (<u>Id.</u>) He explained that "[y]ou were definitely being, you know, aggressive. You were pulling away. You would not obey our orders." (<u>Id.</u>)

Clements was worried "[t]hat you may have some weapons on your person. We didn't have control over you." (<u>Id.</u>) Clements denied that he was frustrated. (<u>Id.</u> at 56.) He testified that "I was worried about our safety." (<u>Id.</u>) Clements stated that "I had been aware of prior encounters where you'd been arrested with weapons, handguns." (<u>Id.</u> at 58.) In response to whether Watson had any firearm convictions, Clements replied, "I work with guys in the police department and over the years I've heard people talk about your history, how combative you are and you are known to carry firearms on your person." (<u>Id.</u>) By "combative," Clements meant that Watson would run and would fight officers. (<u>Id.</u> at 58-59.) Clements testified that "[o]fficers communicate with each other about people who are maybe a danger to us, and you're one of those persons." (<u>Id.</u> at 59.) Watson was considered by some officers to be potentially dangerous "['c]ause anytime that we have any dealing with you, you run. You fight. Sometimes have a firearm." (<u>Id.</u> at 59.)

Clements also testified that he was worried about Watson's safety. He stated: "And also you choking on the marijuana or at that time I figured there was going to be some cocaine in the bag."

14

(Id. at 56.) Clements assumed there would be some cocaine in the baggie because "that's something very common of people who carry narcotics to put cocaine and marijuana in the same baggie and I couldn't understand why you were attempting to destroy a bag of marijuana. You were so dead set on that." (Id. at 57.) Clements acknowledged his previous testimony that he saw a green leafy substance in Watson's mouth, but stated that "cocaine is smaller." (Id.) He was concerned that Watson might choke on the marijuana or overdose on the cocaine. (Id.)

Clements testified that the marked police car the officers were driving did not have a dash camera. (Id. at 59.) He did not attempt to obtain any video from the grocery store. (Id. at 59-60.)

Clements denied that he acted aggressively because he was concerned about the risk to the officers' safety. (Id. at 60.) He responded, "I was concerned. We used very minimal force on you." (Id.) Clements testified that "we had first to gain control over you, your arms. We ended up able to do that after Officer Burrow sprayed you in the face with Pepper Spray. Then I was able to take you onto ground." (Id. at 61.) According to Clements, "[w]e used only the amount of force necessary to effect the arrest." (Id.)

As the officers were struggling to gain control over Watson's arms, Burrow sprayed Freeze+P to his "facial area." (Id. at 62.) At that time, Clements "was able to get behind [Watson] and take [him] down to the ground." (Id.) Watson was "on [his] knees, on [his] side, attempting to get up on [his] knees." (Id.) He was "all over the place." (Id.) Watson noted that Burrow had testified that

15

Watson was on his stomach, and Clements responded: "At certain times, at the very end you were, yes, but you were attempting to get up on your knees and, you know, I was thinking that you were probably going to — the fight was going to be on again and —" (<u>Id.</u> at 62-63.) Clements testified that, "[a]fter repeated commands of telling you to spit out the dope, put your hands behind your back, [I] pepper sprayed you in the face, and the second time the Pepper Spray had the desired effect. The first one did not. Then you spit it out, the marijuana." (<u>Id.</u> at 63.) At that time, Watson was on the ground and, "[a]fter the second burst, [he] quit resisting." (<u>Id.</u>)

Clements could not recall whether Watson was positioned on his side or his stomach after the second burst. (<u>Id.</u> at 64.) Clements testified that "[y]ou was either on your side or on your stomach, and [Officer Burrow] was able to handcuff you." (<u>Id.</u>) Clements stated that "you can be on your side and technically be partially on your belly." (<u>Id.</u> at 65.) Clements denied being on Watson's back while he was on the ground. (<u>Id.</u>) Clements testified that the officers did not put their knees into Watson's neck. (<u>Id.</u> at 65-66.) Clements explained that "[w]e don't put knees in the neck" but "[i]t's very common to put our body weight on somebody's back to control them . . . ." (<u>Id.</u> at 65.)

Clements denied that he was angry or agitated during the encounter. (<u>Id.</u> at 66.) He denied calling Watson a "nigger" during that encounter or at any other time. (<u>Id.</u> at 67.)

Watson was not the target of a police investigation at that point. (Id.) Clements knew who Watson was from seeing him around "and from officers telling about [his] history." (Id.) Clements testified that he would be able to identify Watson if he saw him in the street from "[s]eeing mugshots of [him]. I've seen [him] on the street before. Seen [him] at 1821 Whitney Young," which was the address of Watson's mother, Sadie Powell. (Id. at 68.) Before February 20, 2008, Clements had encountered Watson at 1821 Whitney Young when Clements was looking for Joseph Caldwell at that address. (Id.) The officers who spoke about Watson did not show Clements mugshots. Clements testified that "it's my duty to, you know, if they're telling me about someone who's a threat to officers, you know, I'm going to follow up on that and figure out who they are . . . ." (Id. at 69.)

Plaintiff asked how he could be considered a threat to officers when he has never been convicted of assaulting an officer, and Clements replied, "I know there were several incidents where you were caught with handguns and resisted arrest and run." (Id. at 70.) Clements "was aware of the October 13th [2007] incident where you resisted Officer McDowell and Officer Wright." (Id.) Plaintiff asserted that the charges were dismissed, and Clements replied, "Sometimes they may get dismissed to dispose of a felony. If you had several prior, if you had several felonies, they may dismiss the misdemeanors for a plea bargain. So, that's very common." (Id.) Clements denied that charges might be dismissed because the arresting officer lied. (Id.)

17

Clements recalled that Watson had spoken to him previously when Clements was trying to execute a fugitive warrant at 1821 Whitney Young. (Id. at 71.) According to Clements, Watson was on the porch and "I believe [he was] mouthing to us, trying to instigate officers while we were on the street." (Id.) Clements did not recall the year this incident occurred. (Id. at 72.) He denied feeling resentment because of that encounter. (Id.) Clements stated that "I'm not saying that was the very first time I ever met you. . . . That's the only incident I can think of offhand right now before this incident occurred." (Id. at 79.)

Clements testified that some citizen complaints have been filed against him while he was employed with the DPD. (Id. at 72.) He was unsure of the number, but stated that "it's not that many." (Id.; see also id. at 74 (same).) Clements said that "we may get one and never be aware of it." (Id. at 73.) Clements has never been placed on desk duty because of a citizen complaint (id.), and his duties have never been restricted in response to a complaint (id. at 74). Clements could not recall the issues raised in any citizen complaint, and he emphasized that "I never have been found doing any wrongdoing." (Id.) Clements testified that he did not keep track of citizen complaints filed against him: "It's not relevant to me on how I do my job, no. So, I'm not interested in it; but if you're trying to say I've had a lot of them, no, I have not had a lot of complaints." (Id. at 75.) Clements explained: "Sometimes when you're — you put someone, you know, a felony charge on someone, they're going to go to prison, that may be a tactic to

combat their charge, trying to make a complaint. So, that's why I'm not concerned with them." (Id.)

Clements was not aware that any of the citizen complaints against him involved excessive force or racism. (Id. at 76.) Vincent Taylor did not accuse Clements of excessive force or racism. (Id.) The only encounter Clements had with Cory Thornton was during the execution of a search warrant, when Thornton "ran off the porch and that's the only incident I ever had with Mr. Thornton and he wasn't even caught. I was inside the house." (Id.) Joseph Caldwell, Watson's nephew, did not make either a formal or an informal complaint about Clements. (Id. at 76-77.)

Clements did not know how many people he arrested each year, but he guessed it was well over a hundred. (Id. at 77.) Clements was asked how many of those arrestees were black, and he stated, "It depends on what side of town you're on." (Id.) He elaborated: "I'll say it's about 50/50. Just last week we indicted 38 people; and out of that 38, probably 30 of them were whites. So, race has nothing to do with how I do my job." (Id.) Clements was not aware that any black arrestee had ever accused him, either formally or informally, of using excessive force. (Id. at 77-78.)

Clements denied ever "overhand strik[ing]" Watson. (Id. at 78.) Clements denied meeting Judge Dean Dedmon in his private chambers to tell him that Watson's bond should be set high. (Id. at 78-79.) Clements also denied having any personal feelings about Watson. (Id. at 79.)

Clements was asked whether he had any conversations with other police officers about Watson between October 2007 and the events at issue, and he responded that he was aware of the incident in October 2007 when Watson "resisted Officer McDowell and Officer Wright." (Id. at 79-80.) Clements related that McDowell and Wright "thought they were going to lose [the fight]. They wasn't for sure whether they was going to lose and we're in a position — a profession where we can't lose." (Id. at 80.) Clements testified that "[y]ou was resisting. They were telling me about this. Officer Wright, he does not usually say stuff like that 'cause he's a big fella." (Id.) As a result of this information, "[a]s far as officer safety, [Clements] was more alert with [Watson] than with other people." (Id. at 81.) Clements denied that he was more aggressive or more assertive than he might ordinarily be. (Id.) Clements was asked about the effect of adrenaline, and he stated, "Sometimes you have adrenaline, of course. That's human nature but, no, the only — only amount of force necessary was used in your incident." (Id.) Clements stated that "[t]here was not loud music playing" when he was instructing Watson to spit out the drugs. (Id. at 81-82.) The radio "was not in violation of a noise ordinance." (Id. at 82.)

Dyersburg police officers use Freeze+P pepper spray "to gain control of someone who's not listening, someone who's resisting." (Id.) The spray is "an irritant, as far as eyes and nasal." (Id.) "It can make someone close their eyes and irritate them." (Id.) During his training at the Dyer County Jail in 1999, Clements was sprayed with Freeze+P pepper spray. (Id. at 83.) He acknowledged

that the spray "burns" and "don't feel good," but he also stated that "[i]t's not the worst pain I've ever had in my life, no." (Id.) Clements also testified that the effects of the spray wore off after about fifteen minutes. (Id. at 83-84.)

Watson concluded his case in chief by testifying on his own behalf. Watson stated that, on February 20, 2008, he was in a vehicle with his daughter, "E.M.", and another passenger named Terry Mitchell. (Id. at 86.) According to Watson:

> I was stopped by Officer Burrow and Officer [Clements]. During the traffic stop — well, actually, I pulled into the gas — to a store parking lot. The officers pulled in behind me, activated their overhead lights.
>
> The officer — Officer [Clements] approached the driver's side of the vehicle where myself was occupied. I was in the driver's seat. My daughter was in the passenger's seat. Mr. Mitchell was in the back seat.
>
> Mr. [Clements] approached the driver's side of the vehicle where I rolled the window down. He was talking. The music was up, not extremely loud but a little louder than what — where I could understand — where I could actually hear what he was saying. So, like I say, I rolled the window down in an attempt to better hear what he was saying.
>
> You know, it was a lot of between the music and his, you know, his barking, I was — wasn't really able to fully understand exactly what he was saying. He snatched the door open. He grabbed me. He pulled out his Freeze. He was about to spray in the vehicle.
>
> I begged Mr. [Clements], "Please don't spray in the car. You know, I have a child in here."
>
> He actually did take notice. He looked at my child, told me to exit the vehicle. I exited the vehicle.
>
> I voluntarily put my hands in the air and said, "I am not resisting."

At this point Mr. [Clements], Mr. Burrow started a series of — I don't — you know, I felt like they were marshal [sic] art moves or something, you know, arm bars and arm twists and pulled, both pulling me in their direction. One was to my left. One was to my right. They were both pulling on me, twisting on me.

Whole time I'm saying, "I'm not resisting. I'm not resisting."

That's when I was actually — I don't know which — I didn't know until this morning which one actually sprayed me in the face. One of them sprayed me in my face with some Freeze spray.

At this point, you know, some more of these combative moves were executed. I was taken down to the ground, face fist, pretty hard. I was sprayed again in the face. My arms were twisted behind my back.

One of the officers put his knee in my neck with his body weight and pressed down on my neck, pinned me to the ground. The other officer, I assume, was handcuffing me. After I was handcuffed, I was sprayed again, not once but at least twice.

And, you know, throughout all of this Officer [Clements] used very inappropriate racial slurs like "nigger" this, "nigger" that, you know, "Stop moving, nigger."

And I was taken to jail.

(Id. at 86-89.)

Plaintiff contends that "some of my jewelry, really expensive jewelry, nice jewelry was destroyed" in the February 20, 2008 encounter. (Id. at 91.) "Like, you know, a Breitling watch was broke. Never worked again after that day. A necklace was broke, you know, disappeared." (Id.)

Watson asserts that the incident on February 20, 2008 was not isolated but "it was a series of events that led up to this." (Id. at 89.) Watson contends that "all these [prior] events in my

opinion are very relevant because it actually shows the motive for why these assaults had taken place." (Id.) According to Watson, other police officers did not treat him as a threat but were, instead, "always pretty cordial and respectful." (Id.) Burrow and Clements, on the other hand, "every time they see me, it doesn't matter if I'm in front of my children, in front of other people children, in front of old women, right next door to a church, these people are jumping on me; and they beating me up." (Id. at 89-90.)[5] Watson acknowledged that he has "always been, I don't know, a little more forward, I suppose, in voicing my opinion about things." (Id. at 90.) According to Watson:

> [T]here's a series of events that — different run-ins that I had with Mr. Burrows, Mr. [Clements], a couple of the other officers that were actually named who were released from this 1983, you know. There were just multiple run-ins with these guys; and, you know, every time I see these guys, like I said, these guys, you know, were, as Mr. [Clements] said, they were ready to fight. Every time they see me, they viewed it like a fight was about to unfold; and, you know, the worst thing that happened to me, you know, throughout all these fights or whatever is that I've got charged and found guilty of simple possession of marijuana. Simple possession of marijuana in my opinion doesn't warrant this type of viciousness, this type of aggressiveness.

(Id. at 90-91.)

Watson testified that, after his arrest on February 20, 2008, he was charged with possession of marijuana, resisting arrest, tampering with evidence, and driving on a suspended license. (Id.

---

[5]     This testimony appears to be inconsistent with an objection made by Watson to Clements' testimony that he knew of Watson before February 20, 2008. At that point, Watson stated, "Well, Mr. [Clements], prior to you beating me up, I didn't remember you. So, I don't understand how you remember me so well. How do you know me if I don't know you?" (Id. at 72.)

at 91.) "[T]he worst charge was a Class E felony," and the other charges were misdemeanors. (Id.) Watson's bond was set at $350,000, which he contends was excessive. (Id.)

By way of background, on April 17, 2007, Watson was shot five times in his head and spine. He was left temporarily paralyzed and blind. (Id. at 92.) At some point, Watson was unable to carry his daughter "because [his] equilibrium was so messed up." (Id.) This testimony was offered to show that Watson was "physically incapable of putting up a fight" when he was arrested in October 2007. (Id.) Watson also testified as follows:

> You know — these same officers had, after knowing that I had been shot, they simulated with their fingers a gun and pointed at me and pulled the trigger and I take that to be a threat on my life.
>
> They knew I'd been shot; and if it wasn't a threat on my life, it was done in very poor taste, very poor humor, you know. I had been shot in my head, you know, in front of my children.

(Id. at 93.) It is unclear when Watson claims the officers simulated this conduct.

Plaintiff contends that it was unfair for officers to perceive him as a threat because he had never been convicted of resisting arrest. (Id. at 93-94.)

On cross examination, Watson admitted that, on February 20, 2008, he was violating the law by driving on a suspended license. (Id. at 95.) He understood at the time that he was breaking the law. (Id.) When the officers activated their blue lights, Watson knew that he was being detained. (Id.) He had previously been

pulled over by law enforcement officers and, because of that experience, he understood what was happening. (Id.)

Watson also admitted that he had marijuana in his possession on February 20, 2008. (Id. at 96.) Watson pled guilty to a charge of possession of marijuana that resulted from his arrest on February 20, 2008. (Id.)[6] At the time, it was Watson's practice to store marijuana in his mouth. (Id.) He routinely stored marijuana in his mouth when he was out in his car. (Id.) Watson knew that possession of marijuana was illegal. (Id.) He also knew that Officers Burrow and Clements could arrest him for possession of marijuana. (Id. at 96-97.)

Watson had previous convictions for possession of illegal drugs. (Id. at 97.) In August 2005, Watson was indicted in the Dyer County Circuit Court for sale of cocaine over 0.5 grams. He was later convicted of that offense. (Id.)[7] Watson was convicted in the Dyer County Circuit Court of possession of marijuana arising from an incident on October 13, 2007. (Id. at 97-98.) That charge was pending on February 20, 2008. (Id. at 97-98, 99.)[8]

Watson admitted that he had marijuana in his mouth when Officer Clements approached his vehicle on February 20, 2008. (Id. at 99.) He also admitted that his music was turned up loud. (Id.)

---

[6]     Plaintiff's Dyer County conviction for simple possession of marijuana arising from the February 20, 2008 incident was admitted as Exhibit 2. (Id. at 138-39.)

[7]     Plaintiff's Dyer County felony conviction for Sale of Cocaine Over .5 Grams was admitted as Exhbit 3. (Id. at 139.)

[8]     Plaintiff's Dyer County conviction for Simple Possession of Marijuana arising from the October 17, 2007 incident was admitted as Exhibit 4. (Id.)

Because of the loud music, he could hear the officers but could not understand what they were saying. (Id.) Watson testified that "I couldn't say just exactly what they were saying; but, you know, I could just assume." (Id.)

Watson assumed the officers were asking for his driver's license. He did not assume that they were asking him to get out of the vehicle. (Id.) At his deposition on July 30, 2010, Watson testified that he assumed that Clements was telling him to get out of the vehicle. (Id. at 99-101, 103.)[9] The marijuana was in Watson's mouth until after he was on the ground. (Id. at 103-04.)

Watson testified that he was handcuffed when Officer Clements sprayed him with Freeze. (Id. at 104.) At his deposition, Watson testified that he did not recall when he was placed in handcuffs (id. at 104-06), although he did say that "I'm sure they restrained me immediately. They cuffed me immediately" (id. at 106). In his interrogatory answers, which covered both the October 13, 2007 and February 20, 2008 incidents, Watson listed the use of pepper spray after he had been handcuffed as one basis for his claim of excessive force. (Id. at 106-08.)[10] At his deposition, Watson testified that that interrogatory answer referred only to the

---

[9]     Watson testified that he was unable to recall everything that happened at his deposition because "[t]hat was a while back and I do have brain damage and I try to write everything down and keep everything fresh and crisp." (Id. at 100; see also id. at 101 ("I have some issues with my memory.").) Watson testified that he truthfully answered the questions asked at his deposition. (Id. at 101-02.)

[10]     Plaintiff's responses to Defendant's First Set of Interrogatories and Requests for Production of Documents to Plaintiff was admitted as Exhibit 8. (Id. at 145.)

October 13, 2007 incident. (<u>Id.</u> at 108-10.) In his complaint, which was sworn to under penalty of perjury, Plaintiff did not allege that he was handcuffed during the February 20, 2008 incident. (<u>Id.</u> at 111-13.)

Watson testified at trial that he voluntarily exited his vehicle with his hands in the air and told the officers that he was not resisting. (<u>Id.</u> at 113.) In his complaint, which was sworn to under penalty of perjury, Plaintiff stated that Burrow and Clements pulled him out of the vehicle. (<u>Id.</u> at 113-14.) Plaintiff's complaint was signed four month after the events at issue. (<u>Id.</u> at 114.)

Watson agreed that he had previously informed the Court about the disability caused by his having been shot in 2007. (<u>Id.</u> at 114-15.) Watson previously estimated that he is only functioning at 85% of capacity. (<u>Id.</u> at 115.) The injury affects Watson's ability to retrieve memories. (<u>Id.</u>) He has episodes of bad memory almost every day. (<u>Id.</u>) Plaintiff takes psychotropic drugs that affect his mental functioning. (<u>Id.</u> at 115-16; *see also* <u>id.</u> at 11-12 (Plaintiff's opening statement).)

Watson was transported to the Dyer County Jail after his arrest on February 20, 2008. (<u>Id.</u> at 116.) An Inmate Medical Form completed by Jail staff at about 4:49 p.m. on February 20, 2008, stated "Inmate appears to be in good health. Has been sprayed with Freeze by D.P.D." (<u>Id.</u> at 118-19.) The only property listed on an

Inmate Personal Property Form was two earrings. (<u>Id.</u> at 119-20.)[11]

Watson claimed that a Brietling watch was broken during the incident on February 20, 2008. (<u>Id.</u> at 120.) In his interrogatory answers, Plaintiff listed the damages he claimed to have suffered from the incidents of October 17, 2007 and February 20, 2008. Those damages included a Breitling watch valued at $3500. (<u>Id.</u> at 121-23.) At his deposition, Plaintiff testified that the items lost in the February 20, 2008 arrest were a yellow gold necklace valued at $1000, a diamond medallion valued at $1000, and a pair of diamond earrings valued at $2000. (<u>Id.</u> at 123-24.)[12]

Watson was previously convicted by guilty plea in the Circuit Court for Weakley County, Tennessee, of aggravated assault with a weapon. The date of the offense was June 5, 2005. (<u>Id.</u> at 128.)[13] Watson pled guilty to TennCare fraud in Dyer County, Tennessee, and was sentenced to a term of imprisonment of two years. The date of that offense was January 2, 2008. (<u>Id.</u> at 132-33.) Watson gave

---

[11]   These documents were not offered or admitted into evidence.

[12]   At his deposition, Watson was not asked about the Breitling watch, which was identified as (E) in the interrogatory answer. The watch was not included in Plaintiff's property when he checked into the Jail. He apparently had earrings when he was booked.

[13]   Plaintiff's Weakley County conviction for Aggravated Assault was admitted as Exhibit 5. (<u>Id.</u> at 142.)

      Plaintiff later stated, after his testimony had concluded, that he was not the aggressor in that incident. He was visiting a cousin in Martin, Tennessee. "These guys attempted to rob my cousin. They shot him; and, you know, I defended us from that position. I didn't hurt anybody." (<u>Id.</u> at 141.) "The judge explained that there was no self-defense law in Tennessee and that's why my charge was reduced to aggravated assault and I was only given three years probation on it." (<u>Id.</u>)

false information to an agency of the State of Tennessee to obtain medical benefits. (<u>Id.</u> at 133.)[14]

Plaintiff has no law enforcement training. (<u>Id.</u> at 134.)

On redirect, Watson addressed the circumstances of his conviction for TennCare fraud. He stated that "I admit I really did deceive TennCare; and it's because I didn't have any insurance. I was shot. I couldn't get any medical treatment. I didn't have any money to pay for it." (<u>Id.</u> at 135.) "I felt like I didn't have any options at the time to obtain any type of medical treatment." (<u>Id.</u>)

Plaintiff explained that, when he drafted his complaint, the instructions said to keep it short. He focused on the October 17, 2007 incident because he sustained the most damage from that encounter. (<u>Id.</u> at 135-36.) According to Watson, "I maybe just barely grazed over the February incident because I really didn't think that they were going to ultimately end up separated and the form, as I say, did say keep it short." (<u>Id.</u> at 136.)

Plaintiff also testified that he has four holes in his ears. (<u>Id.</u>)

Officer Burrow's letter of resignation from the SRT team, dated October 19, 2000, was admitted as Exhibit 7. (<u>Id.</u> at 143-44.)[15] A photograph that purports to show Plaintiff's damaged Breitling watch was admitted as Exhibit 9. (<u>Id.</u> at 146-47.)

---

[14]    Plaintiff's Dyer County conviction for TennCare fraud was admitted as Exhibit 6. (<u>Id.</u>)

[15]    The term "SRT" was not defined in the exhibit or at trial.

Officer Clements was called to testify for the defense. Clements testified that he had lived in Dyersburg his entire life and had been employed by the DPD for twelve years. (<u>Id.</u> at 154.) Clements had "[a]bout 13" years of law enforcement experience. (<u>Id.</u>) At the time of trial, Clements' rank was narcotics officer. (<u>Id.</u>)

Clements attended the Donelson Academy in Nashville, Tennessee, in 2001. (<u>Id.</u> at 155.) Donelson is "an eight-week police academy. You have criminal law. You also have a week of defense tactics, a week of shooting, and also a week of operating motor vehicles." (<u>Id.</u>)

Clements has received additional law enforcement training. In 2012, he went to a school in Meridian, Mississippi to learn about "drug interdiction [and] working informants." (<u>Id.</u>) He has also been to "supervisors schools before and numerous drug schools." (<u>Id.</u>)

Clements is a certified police officer. (<u>Id.</u>) He is required to have 40 in-service hours each year that are devoted to training. (<u>Id.</u> at 155-56.) That training includes "eight hours of defensive tactics." (<u>Id.</u> at 156.) Clements has also received use of force training. (<u>Id.</u>)

Clements has received training appropriate to his current assignment as a narcotics officer. Clements attended a basic narcotics school in Meridian, Mississippi, for two weeks. Earlier in 2012, Clements attended an advanced narcotics school and also

received training on technical surveillance. (Id.) Clements was also trained in the detection of drugs. (Id. at 156-57.)

While working as a law enforcement officer, Clements has frequently encountered illegal drugs. (Id. at 157.) Clements explained:

> Well, I would say 2007, from 2007 until November, 2011, I worked full time with the bike patrol/street crimes. Our main goal was partly narcotics-related gangs and also we got involved with the community, play basketball with kids and stuff but for the last year participation in numerous undercover buys.
>
> Part of my job in the past five years have [sic] been search warrants, getting information from informants of houses that's supposed to have narcotics inside, and vehicle stops also that were the — usually we find narcotics. We, you know, get information from an informant that, you know, it's in a vehicle or a house.

(Id.) During his work as police officer, Clements had seen and smelled marijuana before February 20, 2008. (Id. at 157-58.) Clements was familiar with raw marijuana, which he described as "a green, leafy substance." (Id. at 158.) Prior to February 20, 2008, Clements had encountered raw marijuana "[w]ell over 500 [times] or I'd say probably 800 or more. That's just a guesstimate." (Id.)

Clements also has experience with arresting suspects who are attempting to conceal illegal drugs. (Id.) He stated that "[w]e've had people run from us, throw it, eat it, try to eat it, grind it up in their hands, if it's crack cocaine, several times with just people hiding items or trying to eat it." (Id. at 158-59.) It is "very common" for a suspect to try to ingest an illegal substance because "[t]hey don't want to get caught with it." (Id. at 159.) Raw marijuana is usually stored in a plastic baggie. (Id.) A

31

suspect who ingests an illegal drug "can overdose" or could choke on the plastic bag or on the drugs themselves. (Id.) Marijuana may sometimes "be laced with some kind of PCP or anything." (Id.) It is also "very common" for other drugs, such as "pills or crack cocaine or cocaine," to be stored in a bag containing marijuana. (Id. at 159-60.) These additional substances can pose a danger if swallowed by a suspect. (Id. at 160.) Clements testified that

> I've had numerous stops where the suspect would be successful after swallowing it; and you notice that if it's marijuana not in the bag, you know, it's green residue in their mouth. I've had incidents where somebody, we arrested someone and they later complained that their stomach was hurting them and turns out they ate some meth during the traffic stop.

(Id.)

Clements was trained in the use of force at the police academy and during annual in-service training. (Id.) Clements testified that "[w]e just go over officer defense techniques, handcuffing technical information, soft-hand control. Now we have tasers. We go over tasers and just how to gain compliance from the suspect." (Id. at 161.) The DPD trains officers, including Clements, on a use-of-force continuum. (Id.)

The DPD has a policy on the use of force. (Id.) Clements identified the DPD General Order on the use of force, which was in place on February 20, 2008. (Id. at 161-62.) Clements was trained on the policy in "either January or February" of 2012. (Id. at 162.) A copy of the policy was admitted as Exhibit 10. (Id.) The policy states that "[a] typical escalation of force pattern is as follows: Cooperative Controls, Contract Controls, Compliance

Techniques, Defensive Tactics, and Deadly Force." (Ex. 10 at 1.)
Clements testified that that sentence describes a use of force
continuum. (Tr. 163.) A use of force continuum is

> like cooperative controls. We start out verbal. Someone's
> being compliant and that would be just officer presence
> and instructing someone to, you know, ordering someone to
> do something and they respond.
>
> The contacts controls, that has to do with
> somebody's being passively resistant, not active, and it
> could be you could persuade someone into complying or you
> could use a soft-hand control to, you know, make them be
> compliant.
>
> The compliance techniques, that's when somebody's
> being actively resisting; and that's when you can use
> soft-hand control, Pepper Spray, or taser.
>
> Defense tactics, that's when somebody's being
> actively aggressive and might be some injury to the
> officer and that could be also hard-hand control.
>
> Then deadly force, of course, is when you feel like
> there's a danger to you as an officer or someone else in
> society, being physically harmed, being physically harmed
> that would incur great bodily injury.

(Id. at 163-64.)

The use of force policy recommends contact controls when a
suspect is demonstrating resistant behavior. (Id. at 165; see Ex.
10 at 2 ("When confronted with a suspect demonstrating resistant
behavior, the officer uses low level physical tactics to gain
control and cooperation. These tactics can be psychologically
manipulative as well as physical, and can include additional verbal
persuasion skills, relative positioning strategies, escort
positions, and touch pressure points.").) Contact can include low-
level physical contact. (Tr. 164-65.) One example of a contact

33

control is pulling someone out of a vehicle who is not responding to verbal commands. (<u>Id.</u> at 165.)

Clements testified that the term "cooperative controls," as used in the use of force policy, means "officer presence. It includes methods of officer safety, survival, officer presence, verbal commands, communication skills, restraint techniques, positions, and strategies. It can all — it can all be used. It can be used at all levels of the Use of Force Continuum." (<u>Id.</u>) Cooperative controls are the lowest level of the continuum. (<u>Id.</u>) If a suspect does not comply with verbal directives, other levels of force are recommended and may be required, depending on the circumstances. (<u>Id.</u> at 165-66.) Compliance techniques, including physical contact controls, may be required if a suspect becomes actively resistant. "These tactics should be sufficient force to overcome the active resistance of the subject, and the officer should remain vigilant for more aggressive behavior from the subject." (<u>Id.</u> at 166.) Examples of physical controls "include OC, CS spray, taser, takedowns, presure point application, joint locks, come-along holds, and head demobilization, head stimulation." (<u>Id.</u>) OC spray is the same as Freeze. (<u>Id.</u>) The use of a chemical weapon, such as Freeze, is a compliance technique under the use of force policy that may be appropriate when a subject is actively resisting. (<u>Id.</u>)

Exhibit 11 is the DPD's use of force continuum model, which is part of the use of force policy. (<u>Id.</u> at 167.) Clements was trained on that continuum, which is consistent with the procedures in the

34

use of force policy. (Id.) This continuum model was in place prior to February 20, 2008. (Id.)

On February 20, 2008, Clements was assigned to the DPD's street crimes and bike patrol unit. (Id. at 168.) Clements testified that street crimes and bike patrol is a specialized unit. (Id.)

> We didn't have to answer calls. We just, if it was a warm and pretty day, we go on bicycle. If there was a lot of people out on the street, we — I played games with kids. That's part of it. That's a fun part of it. When we're on bicycle, you hear a lot more as far as loud music. You can smell a lot more as far as somebody smoking marijuana. So, you're able to catch a lot, catch things a lot better.
>
> Another job function we have is that we, you know, stop people, sometimes finding narcotics, sometimes not, just issuing traffic citations.
>
> We also provide a phone for us, the police does. You may have several informants that would call you and may be able to get information for a search warrant or someone who's got narcotics on their persons, get information for that, or someone's got narcotics in a vehicle.

(Id. at 168-69.) The purpose of the unit is "to deter the narcotics and gang activity." (Id. at 169.) Clements testified that "[w]e would stay where we was having the most problems, and the majority of time it was more of your economically deprived neighborhoods," which tend to have higher concentrations of drug trafficking and gang activity. (Id.)

The T&B Grocery in the Finley Street area of Dyersburg is in a high crime area. (Id.) The office of the Bike Patrol Unit was in a housing project a quarter mile from the store. (Id.) Clements was assigned to Bike Patrol full time beginning on April 20, 2007. (Id.

at 169-70.) Since Clements was hired in 2001, the police department has divided Dyersburg into four zones, and the officers rotate from one zone to another. (<u>Id.</u> at 170.) As part of his duties, Clements became familiar with the residents in the area of the grocery store, including residents who were known for criminal activity. (<u>Id.</u>)

Clements recalled learning about an arrest of Plaintiff on October 20, 2007. (<u>Id.</u>) Clements arrived on the scene after Watson had been placed in the patrol car. (<u>Id.</u>) At that time, Clements testified that "Officer Wright and Officer McDowell was telling me about what happened. I worked with them 40 hours a week." (<u>Id.</u> at 171.) It was common for officers to share information about suspects "[i]n case you may encounter them, if someone was, you know, known for resisting or fighting, just for your safety." (<u>Id.</u>)

Clements was aware of Watson's reputation when he encountered him on February 20, 2008. (<u>Id.</u>) Clements was asked how that knowledge affected his behavior, and he responded, "Just more alert, just more alert when I approached the vehicle. I just was making sure he wasn't — like when he went to the glove box, you know, I was trying to see if he got any weapons or anything. I was concerned about that." (<u>Id.</u>)

On February 20, 2008, Clements was "assisting the sergeant in a narcotics roundup where they had conducted undercover street buys and later that there was indictments that come out and we were picking them up. It started at 1:00 o'clock." (<u>Id.</u> at 172.) Clements and Burrow encountered Watson at 2:59 p.m. (<u>Id.</u>) They were

in a marked police car, and Clements was driving. (<u>Id.</u>) When he
approached the vehicle, Watson was seated in the driver's seat.
(<u>Id.</u>) According to Clements:

> When I first approached, saw him get something out
> of the console. I approached the vehicle and I was — got
> right beside him and noticed he had a look of
> concentration on his face and got around to the mirror
> and I could see him chomping, chewing on something, and
> could see glimpses of a green, leafy substance that I
> believed to be marijuana in a plastic baggie.

(<u>Id.</u> at 173.) Clements' identification of the substance as
marijuana was based on his "years of experience, seeing it on the
streets." (<u>Id.</u>) Clements testified that he was standing at the
driver's side mirror: "I could basically — I may have been touching
it." (<u>Id.</u>) Clements believed that Watson "was trying to tamper with
evidence by trying to get rid of it before he got arrested and
charged with it." (<u>Id.</u>)

Clements testified that he gave Watson several verbal commands
to spit out the marijuana. (<u>Id.</u> at 173-74.) "I did numerous times.
I opened up his door, told him to spit it out. He wouldn't do it.
He wouldn't — just totally ignoring me. Told him to get out of the
vehicle numerous times. He wouldn't." (<u>Id.</u> at 174.) Under the DPD
Use of Force Policy, a subject's failure to comply with verbal
commands is classified as "[r]esistant/passive." (<u>Id.</u>) The
appropriate response is a contact control, which is one level above
cooperative controls or verbal commands. (<u>Id.</u>)

Clements testified that

> I attempted to pull him out the first time. Was
> unsuccessful. He was holding onto the seat.

37

The second time we got him out; and we kept on telling him, we told him several times to get out. He wouldn't do it. Told him to spit it out. He wouldn't do it. Told him to put his hands behind his back. He wouldn't.

That's when Officer Burrow sprayed him in the facial area with some Freeze Plus P.

(Id. at 175.) Before Burrow sprayed Watson, Clements had attempted a "straight arm bar takedown. I attempted to take him down but couldn't. His arm movements, he was resisting both of us." (Id.) A straight arm bar takedown is "where you grab somebody's wrists and around their elbow and you lean your weight, your body weight, down to the ground and try to have the momentum take them with you but it didn't work out" because "[h]e's too strong." (Id. at 175-76.) A straight arm bar takedown is a compliance technique on the use of force continuum. (Id. at 176.)

Watson was handcuffed "[a]fter he spit out the marijuana." (Id.) Clements explained:

After Officer Burrow pepper sprayed him, I was able to get behind him and trip him up and he still, when we got him on the ground, he was still trying to get to his knees and we were trying to put some of our body weight on him and that's when I pepper sprayed him.

The whole time we're telling him to put his hands behind his back. He never said anything. He wasn't talking at all. He was still trying to chew up the marijuana and swallow it.

After I pepper sprayed him, it was effective. The first one was not effective that Officer Burrow sprayed. It was effective enough to have him spit out the marijuana. Then we placed handcuffs on him.

(Id.) The use of force ceased "[w]hen he spit out the marijuana and was handcuffed and he quit resisting." (Id. at 177.) Clements

denied that any force was used against Watson after he was handcuffed. (Id. at 176-77.)

At no time during the encounter did Watson say or do anything that led Clements to perceive that he was going to stop resisting and comply with the officers' commands. (Id. at 177.) Clements testified that Watson "just had one goal, swallow the marijuana and chewing the marijuana up. He never said anything. He never complied. He was pulling away from us and wouldn't listen to a word we said." (Id.) Clements testified that, at the time, Watson "was quite a bit bigger than me. I would say he's probably about 250, 260 on that day." (Id.) Watson had a muscular build, whereas Clements was "average. I'm not muscular. I don't work out, but he was stronger than us." (Id.)

After Watson was handcuffed, the officers "sat him up, and somebody had some water. He was asking for some water and somebody had some water in their trunk and I poured it over his eyes to help decontaminate him." (Id. at 178.) After that, Clements and Burrow "transported him to booking and then in booking we had some kind of wipes there for Pepper Spray to relieve it and he wiped it with the wipe then at the booking." (Id.) Clements testified that Watson "was cooperative and as nice as he could be after he's placed in cuffs." (Id.) Clements believed that, after the incident, Watson "was fine. He — he talked before about how he was handicapped. To me he was more like an athlete. He was perfectly fine. He never complained about anything besides his eyes and we took care of that and he was pleasant during the booking process." (Id. at 181.)

Watson did not make any complaints about his physical condition. (<u>Id.</u>)

Clements did not notice any jewelry or personal accessories lying about at the scene. (<u>Id.</u>) If the officers had found any such items, Clements testified that, "[i]f we believed it was his, we would have put his property, put it in his lap, in his pocket." (<u>Id.</u> at 182.) Watson did not make any complaints about missing or broken items. (<u>Id.</u>)

Watson was booked at the DPD and, when that was completed, Clements and Burrow transported him to the Dyer County Jail. (<u>Id.</u> at 178.) In addition to the charge of possession of marijuana, to which he pled guilty, Watson was also charged with tampering with evidence, driving on a suspended license, and resisting arrest. (<u>Id.</u>)

During the encounter with Watson on February 20, 2008, the officers first used cooperative controls without success. Contact controls were then used unsuccessfully. The officers finally used compliance techniques, which were eventually successful. (<u>Id.</u> at 179.) The purpose of Freeze is "[t]o prevent injury to the officer and the suspect when someone's actively resisting, to take the fight out of them." (<u>Id.</u> at 180.) In this case, Watson ceased resisting after the spray was used. (<u>Id.</u>) Clements believes that the actions taken by Officer Burrow and himself complied with the DPD's use of force policy and use of force continuum. (<u>Id.</u>) Clements does not believe that the force used by Officer Burrow and himself was unlawful. (<u>Id.</u> at 180-81.) He also does not believe

that either he or Officer Burrow took any action that was unreasonable under the circumstances. (Id. at 181.) Watson physically resisted the officers when they tried to arrest him. (Id. at 182.) He tried to swallow marijuana despite Clements' verbal command to spit it out. (Id.) Clements believed he did not use any greater force than was necessary under the circumstances. (Id.)

On cross examination, Clements stated that he was thirty-four years old. (Id.) He testified that he had not played basketball with neighborhood children recently but, when he was on bike patrol, he used to play basketball at the Bruce Community Center or "at the future city rec center . . . ." (Id.) Clements said that he "like[s] playing basketball" and he is "pretty good at basketball . . . ." (Id.)

Soft-hand control is "[j]ust grabbing hold of someone, like trying to get you out of the vehicle." (Id.) Hard-hand control "could be strikes." (Id.) Clements testified that soft-hand controls were used on Watson. (Id. at 184.) Head destabilizing is "hold[ing] someone's head in case they try and spit on you." (Id.) Watson asked whether putting a knee on someone's neck or head was another technique for head destabilizing, and Clements responded, "We didn't do that to you. That's not true." (Id. at 184-85.)

Clements denied that he was confined to black communities while on bike patrol. (Id. at 185.) He stated that "[w]e'll go all over town" and also stated that "we are normally in the high-crime areas." (Id.) Clements denied that the high-crime areas are

41

normally black areas, stating that "we also spend a lot of time in Milltown and that's mostly . . . white." (<u>Id.</u> at 185-86.) Clements denied that members of the black community are afraid of him. (<u>Id.</u> at 188.) He stated: "The only people we ever have problems with are the ones who are doing illegal activities like selling narcotics . . . ." (<u>Id.</u>)

Clements was unsure whether he knew that Watson had not been in Tennessee from the end of 2005 until late 2007. (<u>Id.</u> at 189.) He testified that "I remember after we arrested you the first time or Officer Wright arrested you the first time that you had been out of town, but I don't know how long." (<u>Id.</u>) Clements denied striking Watson during the arrest on October 17, 2007. (<u>Id.</u> at 190.) He testified, "I was not even in the house. That is not true. I was not there until after you was in the vehicle." (<u>Id.</u>)

Clements clarified that Watson was reaching into the console or armrest, not the glove box, when he approached the vehicle. (<u>Id.</u> at 190-91.)

Clements could not recall the details of a single citizen complaint that had been filed about him. (<u>Id.</u> at 191.) He testified that "I don't have access to them. Our administrative lieutenant has them." (<u>Id.</u>) Clements has "sometimes" been addressed by police department administrators about citizen complaints that have been received. (<u>Id.</u> at 191-92.) He stated that "I've had them for someone saying they ran a — didn't run a stop sign when I believed they did or I saw they did, you know . . . ." (<u>Id.</u> at 192.)

Clements confirmed that Watson was passive/resistant while inside his vehicle. (_Id._) Clements stated that, if he had used force on Watson after he was handcuffed, he would not lie about it. (_Id._ at 193-94.) Clements also denied that that happened. (_Id._)

Clements denied that he was ever physically abusive while arresting Maurice Ward. (_Id._ at 195.)

On redirect, Clements testified that citizen complaints against police officers are common: "It happens a lot, especially when you're doing — I'm bragging but doing a good job and getting some of the right people off the street, that's, like I said earlier, that's one way to combat. They think that if you — they come up there and complain on an officer that the bosses will tell us to, you know, stay out of that area; or don't pull people over." (_Id._ at 203.)

The DPD has an Internal Affairs investigation department. (_Id._) Clements believes that the chief of police is responsible for determining whether a complaint is valid. (_Id._ at 203-04.) Clements has no role in deciding whether citizen complaints are pursued through the internal affairs process. (_Id._ at 204.) An officer is made aware when Internal Affairs finds that he acted improperly. (_Id._) If Internal Affairs is investigating a complaint, the officer will learn the results whether the complaint is founded or unfounded. (_Id._) Clements was not certain when an internal affairs investigation would be triggered. (_Id._) An officer may never learn of a citizen complaint that does not result in an investigation by Internal Affairs. (_Id._ at 204-05.)

Watson's booking photograph for the arrest on February 20, 2008 was admitted as Exhibit 12. (Id. at 205-06.) Clements testified that the photograph was consistent with Watson's build and appearance on that date. (Id. at 205.)

On recross examination, Clements testified that he weighs 202 pounds. (Id. at 207.) Exhibit 12 reflects that Watson weighed 225 pounds when he was booked. (Id.)

Clements reiterated his belief that people sometimes file citizen complaints because an officer is effective and they hope he will be ordered to lay off. (Id. at 208-09.) Clements did not know whether copies of citizen complaints go in an officer's personnel file. (Id. at 209.) He stated that "I never have done anything wrong in law enforcement as far as illegal, any criminal activity." (Id. at 209-10.) Watson asked Clements whether the fact that Burrow had only received one complaint meant that he was not doing a good job, and he responded that Burrow "had to answer calls. We were — we didn't have to answer calls. Our only job was to ride around on bicycles and make traffic stops. So, we didn't have to answer calls." (Id. at 211.)

The defense called Officer Burrow, who testified that he had lived in Dyersburg his entire life and had been employed by the DPD for "[a] little over 15" years. (Id. at 214.) His position at the time of trial was patrolman. (Id.) He is also a certified K9 officer. (Id.) Burrow was a K9 officer on February 20, 2008. (Id. at 215.) He had almost nineteen years of experience in law enforcement. (Id.) Prior to his employment with the DPD, Burrow was

44

employed by the Lake County Sheriff's Department in Tiptonville, Tennessee. (_Id._)

Burrow received his law enforcement training at the Donelson Academy in Nashville in 1995. (_Id._ at 215-16.) The Academy provides "an eight-week basic police course. It deals with police history, laws, emergency vehicle operation, firearms, physical/defensive tactics, use of force, such as that." (_Id._ at 216.) Burrow also receives forty hours of in-service training annually and has attended "a few schools." (_Id._) Burrow has "been to numerous [drug] interdiction schools, highway interdictions, criminal interdictions, as well as SWAT schools." (_Id._)

In the course of his training and experience as a law enforcement officer, Burrow has encountered marijuana "numerous" times. (_Id._) Prior to February 20, 2008, Burrow had encountered marijuana hundreds of times. (_Id._) Raw marijuana is "a green, leafy substance." (_Id._ at 217.) Burrow has previously encountered suspects with marijuana in their possession and suspects who tried to conceal marijuana. (_Id._) Suspects may "keep it in their clothing, in their socks, shoes. A lot of times they'll have it in their pockets." (_Id._) Marijuana is usually stored in a clear plastic bag. (_Id._) Burrow has encountered suspects who tried to ingest drugs, including marijuana. (_Id._) That has occurred "[q]uite a few [times]. I don't know an exact number." (_Id._) That practice can present risks to the subject, including the risk of overdose, depending on the drug that is ingested. (_Id._ at 218.) A subject could also choke on the marijuana. (_Id._) It is possible that

45

marijuana might be laced with other substances, although Burrow has never encountered that situation. (_Id._) Ingesting the drugs is one way in which a suspect may try to conceal evidence "[t]o keep from being caught with it, arrested." (_Id._) Suspects will also frequently throw the drugs to distance themselves from them. (_Id._)

The DPD provides its officers with forty hours of in-service training every year. (_Id._ at 219.) That training includes training in the use of force, "[l]ike handcuffing techniques, dealing with suspects, how to defend against being attacked, things such as that." (_Id._) The DPD has a use of force continuum and trains its officers on that continuum during in-service hours. (_Id._) Officers are trained using various scenarios that might or might not call for the use of force. (_Id._ at 219-20.) Officers are also trained to spray Freeze+P at a target. (_Id._ at 220.) The DPD has a policy on the use of force that addresses the situations in which use of chemical spray is appropriate. (_Id._) According to the policy, use of a chemical spray is appropriate "[w]hen they resist your efforts to place them into custody, place them under arrest." (_Id._) Use of a chemical spray is also appropriate when a suspect refuses verbal commands. (_Id._ at 220-21.) The advantage to using chemical spray is that "[i]t's not as bad a side effect as getting struck with a baton." (_Id._ at 221.) Use of chemical spray usually helps get the suspect under control and prevents the situation from escalating. (_Id._) Use of the spray can prevent both suspects and officers from getting hurt. (_Id._) Chemical spray is a compliance technique on the use of force continuum. (_Id._)

Prior to February 20, 2008, Burrow was familiar with the area around the T&B Grocery. (Id.) Burrow had previously been assigned to that zone a a K9 officer and as a patrol officer. (Id.) Officers are assigned to zones for a month at a time, and Burrow had been assigned to the zone where the T&B Grocery is located at different times during his career with the DPD. (Id. at 222.) Burrow knew that the zone was "a high-crime area, drugs and gangs." (Id.) Burrow was also familiar with residents of the area who engage in criminal activity. (Id.)

Burrow testified that he had problems with Watson during previous arrests. According to Burrow, "during the arrest in 2004 he did evade. I had — I had taken a counterfeit hundred dollar bill off of him and he grabbed it out of my hand and took off running." (Id.) Burrow perceived that as Watson "not wanting to get arrested. You know, he began to evade. I perceived that he knew the bill — I knew the bill was fake. He knew it was fake. So, he was getting rid of the evidence." (Id. at 224-25.)

During the same incident, Watson attempted to destroy marijuana. Burrow testified that, "[a]t the end of the chase, I located him in a business inside a bathroom and he was flushing the commode and when I took him into custody, another officer arrived. I looked in the commode, and it was marijuana and a blunt spinning around." (Id. at 225.) Burrow also knew of a prior incident in 2007 in which Watson had a weapon. (Id.)

Burrow recalled these prior incidents when he encountered Watson on February 20, 2008. (Id. at 225-26.) Those experiences

47

"made us a little more cautious since I had found a weapon on him before." (Id. at 226.) Because Watson had previously been found to have a weapon, the officers wanted to ensure that he would not have access to any weapon on that occasion. (Id.) Burrow testified that "[i]f you have them out of the vehicle, you don't want them back in the vehicle. You want to try to maintain control of them." (Id.)

Burrow also testified that it is important to gain control of a suspect who is resisting arrest as quickly as possible "[t]o keep you from getting hurt, other officers or the suspect." (Id. at 227.)

On February 20, 2008, Burrow was "participating in a narcotics roundup where people had been indicted." (Id. at 227.) The officers encountered Watson at approximately 3:00 p.m., near the end of the roundup. (Id.) Watson was operating a motor vehicle near the intersection of Rawles and Finley near the T&B Grocery. (Id.) Burrow was aware that Watson's license had been revoked, and he communicated that fact to Clements. (Id. at 227-28.) After they stopped in the T&B parking lot, Burrow stayed in the patrol car to radio dispatch. He explained that "[t]hat's a safety issue. You let everybody know where you're at in case the stop goes bad." (Id. at 228.) Burrow testified that "I can talk on the radio and still look straight ahead. I'm still aware what's in front of me." (Id.) While he was on the radio, Burrow watched what was happening outside the vehicle. (Id.)

Burrow recalled that Clements "was yelling for Mr. Watson to step out, get out of the vehicle. He was moving around a lot." (Id.

48

at 229.) When Burrow was through talking to dispatch, he joined Clements. (Id.) Clements was standing at the driver's door, about an arm's length away from Watson. (Id.) Clements told Burrow that Watson had "weed in his mouth." (Id.) Burrow thought that "[w]e were trying to place him under arrest. We needed to get him out before he could possibly choke on it or OD." (Id.)

Burrow had previously encountered suspects with illegal drugs in their mouths (id. at 229-30), and he stated that, "[i]f you have something in your mouth, it's hard to talk" (id. at 230). He continued: "Normally when I would stop Mr. Watson, he was talkative. That time he was not." (Id.) Burrow could not recall the quantity of marijuana that Watson spit out of his mouth, but he estimated it to be about two grams. (Id.) The plastic bag of marijuana was "[l]ike ping-pong size, maybe a little less . . . ." (Id.) Burrow had previously encountered suspects with ping-pong ball sized bags of marijuana in their mouths, and he stated that it affected their ability to communicate. (Id.) "They're not able to talk. They mumble. It's — you can tell they have something in their mouth." (Id. at 231.) Burrow testified that, when a suspect has a bag of that size in his mouth, "I can't understand what they're saying most of the time." (Id.)

Verbal commands are at the lowest level of the DPD's use of force continuum. (Id.) Verbal commands are an example of cooperative controls. (Id.)

Burrow was familiar with the DPD's General Order on the use of force. (Id. at 238.) That is the use of force policy he had been

trained on prior to February 20, 2008. (<u>Id.</u> at 238-39.) Burrow was also familiar with the DPD's use of force continuum, which he was trained to use prior to February 20, 2008. (<u>Id.</u> at 239.) Burrow testified that the force used by him and Office Clements on February 20, 2008 was consistent with the DPD's use of force policy and use of force continuum. (<u>Id.</u> at 239-40.)

Burrow testified that he used one one-second burst of spray on Watson. (<u>Id.</u> at 240.) Clements used one one-second burst of spray on Watson. (<u>Id.</u>) Watson was actively resistant when Burrow and Clements used the spray. (<u>Id.</u>) The first burst of spray was used "[j]ust after he was removed from the vehicle that I recall." (<u>Id.</u>) The total number of bursts of spray was two. (<u>Id.</u>) Watson did not stop resisting at any time before Clements sprayed him. (<u>Id.</u>) Watson was not handcuffed when Clements used the spray. (<u>Id.</u> at 240-41.) He was not handcuffed when Burrow used his chemical spray. (<u>Id.</u> at 241.) Watson was handcuffed after Clements sprayed him and he stopped resisting. (<u>Id.</u>) The use of force ceased when Watson "was handcuffed, complied and got handcuffed." (<u>Id.</u>)

Watson was charged with possession of marijuana, driving on a revoked license, and tampering with evidence. (<u>Id.</u>) Tampering with evidence is a felony charge. (<u>Id.</u>)

As the senior officer, it was Burrow's responsibility to prepare an incident report. (<u>Id.</u> at 241-42.)[16] The report was prepared "[p]robably within an hour or two after we dropped

---

[16]    Exhibit 13 is the incident report that Burrow completed after the arrest. (<u>Id.</u> at 242.)

[Watson] off at the jail." (Id.) Burrow also prepared a risk management report. (Id. at 243.) A risk management report is required anytime an officer uses force. (Id.)[17] The report reflects that soft hand force was used and that a chemical agent was used two times. (Id. at 244.) The report also reflects a supervisor's determination that the incident did not require further review. (Id.)

Based on his training and experience, Burrow did not believe that any force used by him or Officer Clements on February 20, 2008 was unlawful. (Id. at 245.) Based on his training and eighteen years of law enforcement experience, Burrow believed that neither he nor Officer Clements took any action that was unreasonable under the circumstances. (Id. at 245-46.)

After the incident on February 20, 2008, Watson "appeared to be okay except for the effects of the Freeze." (Id. at 246.) Watson made no complaint about his physical condition after the incident. (Id.) While they were still at the scene, Clements gave Watson water to flush out his eyes and, after he had been taken to the police station, he was given a wipe designed for the removal of pepper spray. (Id.) Watson was given water "[a]lmost immediately when he quit resisting." (Id.) Burrow was not aware that any items of Watson's personal property were broken during the encounter. (Id.)

---

[17] Exhibit 14 is the risk management report for the incident at issue. (Id. at 245.)

On February 20, 2008, Watson resisted when the officers tried to arrest him. (Id.) He refused to spit out marijuana after being commanded to do so. (Id. at 246-47.) Burrow did not use any greater force than was necessary to subdue Watson and prevent him from swallowing the marijuana. (Id. at 247.)

On cross-examination, Burrow was asked whether he believed that citizens file complaints about police officers because the officers are doing a good job, and he responded, "That could vary." (Id.) Burrow explained that "[t]he complaint could be false." (Id. at 248.) He agreed that, ordinarily when a citizen files a complaint, he believes a police officer has done something wrong. (Id.)

Burrow did not believe the situation was under control after he administered the first burst of Freeze and Watson was on the ground. (Id.) He did not administer a second burst of Freeze at that time "'[c]ause I was struggling with you, trying to get your hands behind your back." (Id.)

Burrow testified that the incident in which Watson was passing counterfeit bills was not a traffic stop. (Id.) He stated that "[i]t was a consensual encounter." (Id.) The counterfeit bill that Burrow seized was never introduced into evidence at a trial. Burrow stated that "I never got a chance to." (Id. at 249.) The bill was never turned over to evidence (id.), which suggests that it was not recovered after Watson fled. Burrow stated that he has "seen numerous counterfeit bills" and, "[b]ased on my experience, I believe it to be counterfeit." (Id.)

Burrow confirmed that Watson's flight on that occasion constituted evading arrest. (Id.) Although Watson may not have been formally arrested, Burrow testified that "[w]hen you ran, I told you to stop. You were under arrest. You continued." (Id. at 249-50.) Burrow acknowledged that Watson was acquitted of evading arrest. (Id. at 250.) Watson was acquitted of criminal simulation "'[c]ause you destroyed the evidence." (Id.) The jury also acquitted Watson of tampering with evidence. (Id.)

Burrow testified that it does not bother him that, with the exception of a charge of simple possession of marijuana, every other charge he placed on Watson has been dismissed. (Id. at 252.) Burrow stated that Watson's past possession of a weapon affected Burrow's behavior in future encounters with Watson. (Id.) He stated, "You had been in possession of a weapon before. Therefore, I would be more cautious in the future encounters with you." (Id.) Although the weapons charge was dismissed, Burrow stated that "[y]ou still had a weapon though." (Id.) Burrow conceded that it was "[p]ossible," although "[n]ot likely," that Watson was unaware of the loaded weapon that police found in a vehicle that Watson had borrowed. (Id. at 253.) Burrow explained that, "[w]hether or not you were found guilty, you had a weapon within reach. I'm going to be cautious. It's going to be — it'll affect the way I approach you. I'll be more cautious." (Id. at 254.) "That's with anybody, not just you, if I know they've been in possession of a gun before." (Id.)

Burrow testified that he is a member of the Fraternal Order of Police. (<u>Id.</u> at 247.) He did not know whether the Order requires officers to protect their brother officers. (<u>Id.</u> at 254.) Burrow would protect "the physical wellbeing of [his] partner." (<u>Id.</u> at 254-55.) He would not lie to protect his partner. (<u>Id.</u> at 255.) Burrow was asked whether he agrees with everything his partner does, and he responded, "When I've been around him and there was no wrongdoing, yes, I do." (<u>Id.</u>) He also stated that, "[i]f I saw an officer doing something wrong, I would report it." (<u>Id.</u>)

Burrow was asked whether he might have lost control a little bit in light of the facts that every charge he had placed against Watson had been dismissed except the charge for simple marijuana possession and in light of his concern that Watson might have had a gun. (<u>Id.</u>) He stated that "I've never lost control." (<u>Id.</u>) Burrow denied that Officer Clements lost control during the incident on February 20, 2008. (<u>Id.</u> at 155-56.)

By the time Burrow had finished communicating with dispatch on February 20, 2008, Clements was standing at the driver's door to Watson's vehicle. (<u>Id.</u> at 256.) Burrow did not recall stating previously that Watson had been removed from the vehicle when Burrow finished his call. (<u>Id.</u>)[18] Burrow stated that "I remember you still being in the vehicle. I don't know if you were partially out or not. I don't remember that." (<u>Id.</u> at 257.) In response to whether Burrow assisted Clements in removing Watson from the

---

[18]    That is not an accurate paraphrase of Burrow's previous testimony. <u>See</u> <u>supra</u> pp. 5-6.

vehicle, Burrow responded, "I don't remember grabbing you when you were in the vehicle. I don't remember that." (Id.)

Burrow recalled his previous testimony that Watson had approximately two grams of marijuana in his mouth, which was about the size of a ping-pong ball. (Id.) Watson asked whether an amount of marijuana the size of a ping-pong ball weighs two grams, and Burrow testified, "It would depend on what was in it, if it was like seeds in it. It would vary in weight." (Id.) Burrow conceded that the amount of marijuana in Watson's mouth could have been smaller than a ping-pong ball. (Id. at 258.) He denied that the wad of marijuana was a lot smaller than a ping-pong ball: "I wouldn't say a lot smaller. It could be a little smaller. You had chewed over it. There was slobber all over it, saliva." (Id.) Burrow also stated that "[i]t could have been more than 2 grams. It was smaller because you'd chewed on it." (Id.) Burrow did not recall the weight of marijuana reflected in the lab report. (Id.)

Burrow confirmed that the risk management report stated that soft-hand force was used. (Id.) Burrow denied that the use of force escalated to hard-hand force, which he defined as "striking somebody." (Id. at 258-59.) He stated that "[y]ou were never struck, and I don't remember [Clements] testifying to that." (Id. at 259.) Burrow testified that, "[w]hen we were holding onto you, trying to get your hands behind your back, trying to control you, that's soft-hand force." (Id.) The arm bars were also soft-hand force, as is the use of an officer's body weight to pin a suspect to the ground. (Id.) Burrow would not consider an officer's use of

a knee to the neck of a suspect to pin him to the ground to be soft-hand force, and he insisted that "[t]hat did not happen in this situation." (Id.)

Burrow recalled his previous testimony that, after Watson had been sprayed with Freeze and was on the ground, he was on his stomach and Burrow was behind him. (Id. at 259-60.) Watson asked where Clements was at that time, and Burrow said that "I don't recall if he was behind you or in front of you." (Id. at 260.) "He could have been on either side of you." (Id.) Burrow testified that "I was behind you 'cause I handcuffed you." (Id.) Burrow was asked whether Watson was on his stomach or his side, and he replied, "You could have been a little of both. From where I was, you looked like you were mostly on your stomach; but, I mean, you could have been raised up just a little bit on your side. You can be on your stomach and be on your side, too." (Id. at 261.) Burrow was not certain where Clements was positioned. (Id.) Burrow confirmed that he was behind Watson and Watson was on his stomach. (Id. at 261-62.) Burrow reiterated that, "[a]s I said before, you can still be on your stomach and be up just a little bit on your side." (Id. at 262.) "From my position, it looked like you were mostly on your stomach." (Id.)

The defense called Commander Dennis Mays, a resident of Jackson, Tennessee. (Id. at 264.) At the time of trial, Mays was a law enforcement consultant and trainer and was a vice president of Training Services Group. (Id.) Mays entered law enforcement in 1975 and had over thirty years of experience. He retired in 2008 as a

commander with the Jackson Police Department in Jackson, Tennessee, where he also served as the department's legal advisor. (Id. at 265.) For the eighteen years prior to his retirement, Mays was on the executive command staff of the Jackson Police Department. He was involved in promulgating policies, evaluating situations involving the use of force, and reviewing internal affairs investigations. (Id.) As commander of the Jackson Police Department, Mays supervised subordinate officers and a department of about two hundred officers. (Id.) Mays was also responsible for reviewing misconduct complaints and disciplining officers where appropriate. (Id.)

Mays was asked about his previous law enforcement positions, and he testified that he started in 1975 as an undercover operative. He moved into the Patrol Division, where he spent "two or three years." (Id. at 266.) Mays then "moved over to Metro Narcotics, spent some years there." (Id.; see also id. at 265 (three years as an investigator for the Metro Narcotics Unit).) In 1986, Mays left Narcotics and spent "a little over three years" with the Tennessee Bureau of Investigation. (Id. at 266.) In 1990, Mays was asked to return to the Jackson Police Department as a legal advisor and subsequently was promoted to the command position. (Id.) Mays also testified that he spent eight years running the Criminal Investigation Division of the Jackson Police Department. (Id. at 265.)

Mays obtained a bachelor's degree from the University of Tennessee at Martin in 1986 and received a law degree from the

University of Memphis in 1989. (<u>Id.</u> at 266.) He obtained a license to practice law in Tennessee in 1990. (<u>Id.</u>)

Mays was certified as a police officer from 1975 until 2010. (<u>Id.</u> at 266-67.) During the time he was a certified police officer, Mays received annual in-service training. (<u>Id.</u> at 267.) Mays is a member of the Tennessee Bar Association and is a lifetime member of both the Tennessee Association of Chiefs of Police and the International Association of Chiefs of Police. (<u>Id.</u>) Mays previously testified at least seven times in state and federal court on police procedures or use of force. (<u>Id.</u>)

Training Services Group, with which Mays is presently affiliated, is "a group of instructors that provide law enforcement training to sworn officers." (<u>Id.</u> at 267-68.) Mays gives presentations to police officers "[m]any times a year." (<u>Id.</u> at 268.) That training includes instruction in police procedures and the use of force. (<u>Id.</u>)

Mays attended the Tennessee Law Enforcement Training Academy in Nashville, the same academy that Burrow and Clements attended. (<u>Id.</u>) "That training provided I think it was a week's worth of use of force training and defensive tactics combined. It also covered the constitutional issues of the use of force, the laws of arrest, the laws of search and seizure, et cetera." (<u>Id.</u>) Mays' annual in-service training included the use of force. (<u>Id.</u>)

During his years in law enforcement, Mays has had occasion to use force against a suspect. (<u>Id.</u> at 268-69.) He has encountered subjects who resist arrest but could not estimate the number of

58

instances in which that occurred. (<u>Id.</u> at 269.) Mays stated that "most of that was early on in [his] career" and not within the past ten years. (<u>Id.</u>) Mays has also encountered subjects who try to conceal drugs, including marijuana. (<u>Id.</u> at 270.)

At the Jackson Police Department, Mays supervised the use of force by other officers. (<u>Id.</u> at 269.) Mays read "every use of force report filed by an officer" in the Jackson Police Department. (<u>Id.</u>) While he was a supervisor and commander of the Jackson Police Department, Mays trained officers in "the constitutional issues surrounding the use of force." (<u>Id.</u>) The training that Mays provides to other law enforcement officers includes instructions in dealing with suspects who resist arrest. (<u>Id.</u> at 269-70.) Mays stated that "[t]he training involves giving officers guidance in using the amount of force necessary to overcome whatever resistance they're encountering." (<u>Id.</u> at 270.)

The defense tendered Mays as an expert in police procedures and the use of force. (<u>Id.</u> at 271.) The Court recognized Commander Mays as a person who is qualified to give an opinion as to police procedures and the use of force. (<u>Id.</u> at 272.)

Mays testified that, in forming an opinion about the incident of February 20, 2008, he reviewed the DPD's General Order governing the use of force and the use of force continuum, the declarations of Officers Burrow and Clements, the incident report, the risk management report, Plaintiff's deposition and the exhibits thereto, the personnel records of Officers Burrow and Clements, and the testimony of Officers Burrow and Clements at trial. (<u>Id.</u> at 277-

79.) Mays concluded that "the use of force against the plaintiff was reasonable and not unnecessary or excessive." (Id. at 280.) In reaching that conclusion, Mays "broke the incident down into segments, starting with the officers' confrontation, initial confrontation with Mr. Watson." (Id.) Mays testified as follows:

> I think Officer Burrow testified that he had reasonable suspicion to believe his driver's license was revoked which gave him reasonable suspicion at least to approach Mr. Watson.
>
> When Officer Clements made that approach, you know, it's his testimony that he almost immediately I think saw marijuana placed in his mouth; and that changed the whole complexity of the incident. At that point they've got probable cause to arrest him based on his suspicion of that fact that he was possessing marijuana.
>
> So, from that point forward any use of force was an attempt to take him into custody; and the officers in my opinion didn't use anymore force than necessary to affect [sic] that arrest.
>
> The testimony I heard was that when they pulled him from the vehicle, he began resisting, refused to comply with their verbal instructions, refused to put his hands behind his back; and they escalated a force from mere presence to use of compliance techniques to first attempt to take him to the ground, which I understand was unsuccessful.
>
> Then they used a chemical spray which then permitted them to take him to the ground which I find was completely reasonable and understandable under the circumstances.
>
> Thirdly, once they got him on the ground, the testimony was he continued to resist which resulted in them having to apply a second dose of chemical weapon which at that time officers testified he then complied and permitted him to be handcuffed.
>
> I find all that to be reasonable under the circumstances.

(Id. at 281-82.)

Mays was asked whether it was reasonable for the officers to interpret Watson's failure to respond to verbal commands to spit out the marijuana and exit the vehicle as non-compliance, and he responded that "[m]y opinion is that they had evidence he was not going to comply. That's why they used compliance techniques to get him out of the vehicle." (Id. at 282-83.) In response to why it was important to get Watson out of the vehicle, Mays stated,

> [Number] One, they're justified. They've got probable cause now to take him into custody for possession of marijuana.
>
> [Number] Two, they want him out of that vehicle because they don't know what's in that vehicle. I'm talking in scope of what weapons may be there. They've got to take him into custody. So, they've got to get him restrained.
>
> And all of their use of force was in direct response to his resistance to that.

(Id. at 283.)

In response to whether it was reasonable for the officers to take Watson to the ground, Mays stated, "Well, that's another compliance technique. That's safer for both the individual and the officers because it eliminates the suspect's movements. You can contain those movements, and it's also a technique of where you got them on the ground to get them handcuffed." (Id.) The technique is designed to prevent a situation from escalating. (Id.)

Mays recalled Officers Clements' testimony that, before using chemical spray, he attempted a straight arm bar takedown. (Id. at 283-84.) Mays testified that "[t]hat was the appropriate compliance technique to use at that point." (Id. at 284.)

Mays reviewed the DPD use of force policy that was in place on February 20, 2008. (Id.) That policy contained a use of force continuum. (Id.) "A Use of Force Continuum is guidance that's provided officers generally by policy that gives them guidance on how much force to use in any given circumstance which is dependent on the amount of resistance that they're encountering." (Id.) The use of force policy contains parameters for the use of chemical agents. (Id.) Mays testified that the types of force used by Officers Burrow and Clements "were appropriate compliance techniques to utilize based on the resistance they encountered from Mr. Watson." (Id. at 285.) As an expert on police procedure and use of force, Mays concluded that the DPD's use of force policy and use of force continuum complied with Fourth Amendment standards. (Id.)

Mays stated that it is important for officers to know any risks they might encounter when they deal with a suspect. (Id.) He testified:

> Well, an officer's got to take their training, their experience, and part of the — in making a decision of what course of action to take.

> Part of that experience is knowing who you're dealing with and I've heard testimony of — by Officer Burrow that he had had some prior confrontations with Mr. Watson and that that heightened his alertness or made him more cautious which I think most officers would do in a circumstance when they're dealing with somebody that they've had prior encounters with.

(Id. at 285-86.) It is reasonable for officers to rely on their prior experiences with a suspect when they encounter him again in another arrest. (Id. at 286.) A law enforcement officer's knowledge and experience that a suspect has been known to resist arrest or

destroy evidence "prepares them for the potential; and since they've had these previous occasions, they know the potential's there. So, certainly, I think it affects how they react." (Id.) An officer's knowledge that a suspect may have possessed a weapon in the past should affect how he deals with that suspect. (Id.) Mays explained:

> An encounter with an individual that's had a firearm in the past, then, you know, I'm going to frisk that individual; and I'm going to have a reasonable suspicion to do it simply based on my experience and training. I know that that's a probability, that they're armed.
>
> So, certainly it's going to have a bearing on how I make my approach to that individual and how I use my verbal commands and how I react to any resistance.

(Id. at 287.)

Mays agreed that police officers must make on-the-spot decisions about whether force is needed and how much force is required. (Id.) He explained:

> Yeah, what an officer's going to do is an officer's going to use the force necessary to effect that arrest; and the amount of force utilized is going to be based on, again, the amount of resistance that they encounter from the suspect.
>
> . . . [I]f an individual is told to stop, an officer has reasonable suspicion to detain him, told to turn around and put your hands behind you, and handcuff him, then there's not going to be a use of force.

(Id.)

Mays testified that it is "not unusual at all" for suspects to attempt to conceal marijuana in their mouths. (Id.) An officer can reasonably assume that the suspect is attempting to destroy that evidence by swallowing it. (Id. at 287-88.) Mays stated that there

is a risk to the suspect in swallowing the plastic bag. (<u>Id.</u> at 288.) "I think you've got a choking risk and I certainly am not a medical expert, but I'd say the plastic bag would be pretty hard to digest." (<u>Id.</u>) According to Mays, the officers are "justified in trying to attain that evidence and, again, the amount of force they're going to use in trying to obtain that [evidence] is going to be based on the kind and amount of resistance they encounter." (<u>Id.</u>)

Mays concluded that Officer Burrow and Officer Clements "acted reasonably under the circumstances of this case." (<u>Id.</u> at 288-89.) He stated that "[m]y opinion is that they did not use anymore force than necessary, that they acted as any other reasonable officer faced with the same circumstances would have acted." (<u>Id.</u> at 289.)

On cross-examination, Mays admitted that he was not present during the events of February 20, 2008. (<u>Id.</u> at 290.) Mays stated that he believes in second chances and that a person can change. (<u>Id.</u> at 291.) He denied that he was angry. (<u>Id.</u> at 291-92.) Mays stated that he has children. (<u>Id.</u> at 292.) He had no opinion about whether Watson could be a good father. (<u>Id.</u> at 292-93.)

Mays testified that he took some sociology courses for his undergraduate degree. (<u>Id.</u> at 294.) Mays did not recall whether race relations were covered in a sociology course he took. (<u>Id.</u> at 294-95.)

Mays testified that he is objective. (<u>Id.</u> at 297.) He denied that Watson's criminal history had any bearing on the opinion he formed about the use of force in this case. (<u>Id.</u> at 300, 301.) He

stated that "[m]y evaluation was based on objectively reviewing the facts of what occurred on February the 20th, 2008." (<u>Id.</u>) The information provided was selected by defense counsel, and he reviewed everything he received. (<u>Id.</u>)

Mays had testified as an expert at trial or in a deposition fourteen times. He could not recall how many of those cases involved the use of force. He had been retained forty-nine times since 1995, and one-third of those cases involved use of force. (<u>Id.</u> at 301.) It is not unusual for defense counsel to provide an expert with the criminal history of the individual complaining of excessive force. (<u>Id.</u> at 301, 302.) Mays noted that he had no knowledge of what an attorney might have that was not sent to him. (<u>Id.</u> at 301-02.)

Mays did not believe he spoke to anyone from the DPD before forming his opinion. (<u>Id.</u> at 302.) He testified that "I have had some discussions with some officers from the Dyersburg Police Department about this case, but I couldn't tell you where in the time continuum it occurred." (<u>Id.</u>) Mays never spoke to Watson about the incident. (<u>Id.</u>)

Mays heard and believed the testimony that a final burst of Freeze was administered when Watson was on the ground. (<u>Id.</u> at 304.) Mays was asked whether he accepted Plaintiff's testimony that, when he exited the vehicle, his hands were in the air and he stated that he was not resisting. He responded: "No, not necessarily because I also know that you had a mouthful of marijuana by the testimony — by your own testimony. So, I don't

know how you're going to be yelling at them, 'I'm not resisting,' with a mouth full of marijuana and a plastic bag." (Id.)

Mays testified that he has experience in identifying drugs. (Id. at 304-05.) Mays could not quantify the amount of space two grams of marijuana would take up, but he stated "[i]t's not a lot, if that's your point." (Id. at 305.)   May also noted that "you had a plastic bag in your mouth by your own testimony." (Id.)

Mays discredited Watson's testimony that he was sprayed after he was handcuffed. He testified that "[t]he officers have been consistent in every testimony and every declaration I've seen. They've been consistent with the facts, and it's my opinion that their version is the version I made my determination on." (Id.)

Mays testified that, in some cases, a citizen complaint about an officer means that he is doing a good job. (Id. at 305-06.) "You know, an officer that's out, being proactive — and we'll just use an example, traffic stops, he's going to get more complaints filed against him, valid or not, than an officer that's not proactive. I think that was the point that the officer was trying to make from the stand the other day." (Id. at 306.) Although Mays conceded that some citizen complaints against officers are valid, he also stated:

> I evaluated every complaint that came through that Jackson Police Department; and I can tell you the vast majority of them, the officer did something that was appropriate. They didn't do a good job of explaining it. As a profession, we do a real good job of what we do but not real good at explaining it to citizens. So, they have some misconceptions. That results in complaints.

(Id. at 307.) Mays was not willing to conclude that Officer Burrow was not doing a good job because only one complaint had been filed

against him. (Id. at 306.) He stated, "I'm not specifically speaking to Officer Burrow. I don't know what he does." (Id.)

Mays testified that he is a member of the Fraternal Order of Police and that not all police officers are members. (Id. at 307.) The Fraternal Order of Police is a nationwide organization. (Id. at 308.) Mays denied that his membership in that group made him biased. (Id.)

Mays was asked whether his opinion would change if he knew that there had been a pattern of assaults on Plaintiff by police officers and of unjustified traffic stops, and he responded that "I don't think having any other background information would have altered that because I limited my review to that specific incident." (Id. at 312.) Mays denied that he reviewed Watson's criminal history to find "consistencies." (Id.)

Mays agreed that, if Watson were sprayed while he was on the ground, handcuffed, and not resisting, that that would constitute excessive force. (Id. at 313.) Watson asked Mays about an officer putting a knee to a subject's neck while he was on the ground, handcuffed, and not resisting, and he stated that, if a subject has stopped resisting, "any further use of force is excessive." (Id.)

Watson attempted to present rebuttal testimony on his own behalf. Watson stated that he had an epidural steroid injection to his L4 and L5 discs. (Id. at 318.) The steroid epidural shot occurred at the end of a two-year course of treatment. (Id. at 336.) The Court was prepared to accept Watson's complete medical records from the TDOC as Exhibit 15. (Id. at 327, 342-43.) At

trial, neither party had Watson's entire medical record for the period after February 20, 2008. The defense was expected to supplement the exhibit after trial and to provide a copy to Plaintiff. (*See* D.E. 179 at 2.) To date, the medical records have not been supplied, and Plaintiff has taken no steps to compel Defendants to submit the medical records.

## II.      FINDINGS OF FACT

The Court makes the following findings of fact:

1.    Watson was arrested on February 20, 2008, at the T&B Grocery in Dyersburg, Tennessee. (Stipulation, D.E. 176 at 5.)

2.    On February 20, 2008, at approximately 3:00 p.m., Watson was driving a vehicle near the intersection of Rawles Avenue and Finley Street in Dyersburg. Watson's young daughter was in the car with him. At the time, Watson's driver's license had been suspended or revoked. (Watson Tr. 86, 95; Burrow Tr. 227.)

3.    Officers Burrow and Clements were on duty at the time and observed Watson operating a motor vehicle. The officers were in a marked police car, and Clements was driving. Burrow recognized Watson. The previous week, Burrow had run Watson's driver's license and discovered that it had been suspended or revoked. (Burrow Tr. 18-20, 227-28; Clements Tr. 172.)

4.    Watson pulled into the parking lot of the T&B Grocery and stopped his engine. The officers pulled in behind Watson's vehicle

and activated their blue lights. (Watson Tr. 86-87; Burrow Tr. 30.)[19]

5. Officer Burrow stayed in the patrol car to notify dispatch, and Officer Clements approached the driver's side of Watson's vehicle. The driver's side window to the vehicle was halfway down. Clements observed Watson pull something out of the console and put it into his mouth. Clements saw Watson chewing on a plastic baggie containing a green, leafy substance that Clements suspected was marijuana. (Clements Tr. 49-50, 173.) Watson had a look of concentration on his face, and Clements suspected that he was attempting to ingest the marijuana and the plastic baggie. (Id. at 49-50, 173.) Watson admits he had marijuana in his mouth during this encounter. (Watson Tr. 96.) The officers were concerned that Watson might be injured by choking or by consuming a toxic substance that might be in the marijuana. (Burrow Tr. 217-18, 229; Clements Tr. 56-57, 159-60.)

6. Officer Clements opened the door to Watson's vehicle and gave several verbal commands to Watson to spit out the drugs. (Clements Tr. 49-50, 51, 173-74.)

7. Watson knew that he was being detained by the officers, but he did not respond to Officer Clements' verbal instructions. (Clements Tr. 50-51, 174; Watson Tr. 87, 95, 96-97, 99-101, 103.)

---

[19] Some of the officers' testimony suggests that they decided to initiate a traffic stop and that Watson pulled into the grocery store parking lot when they activated their blue lights. (Burrow Tr. 19; Clements Tr. 49.) It makes no legal difference which version is accepted.

8.   Because Watson did not comply with the instructions to exit the vehicle and spit out the marijuana, Officer Clements had to pull Watson out of the vehicle. Officer Clements was unsuccessful on his first attempt because Watson was holding onto the seat. On his second attempt, Clements was able to extract Watson from the vehicle. (Burrow Tr. 23-25; Clements Tr. 51-53, 175.)[20]

9.   Watson was standing after being pulled from his vehicle. Watson resisted the officers as they attempted to handcuff him by pulling his arms away and thrashing around. (Burrow Tr. 25; Clements Tr. 53-54, 175-76.)

10.   Officers Burrow and Clements were aware that Watson had previously been arrested in the vicinity of a firearm. (Burrow Tr. 40, 225; Clements Tr. 54, 56, 58-59.) The officers were also aware of previous incidents in which Watson had evaded or resisted arrest. (Burrow Tr. 38-39, 222-25; Clements Tr. 58-59, 70, 79-80, 171.) During the encounter on February 20, 2008, the officers were concerned about their safety. (Burrow Tr. 225-26; Clements Tr. 54, 81.)

11.   Officer Clements attempted to perform a straight arm bar takedown to gain control of Watson and place him on the ground, but

---

[20]   Plaintiff is correct that there are some discrepancies in the officers' testimony. Clements testified that, at some point, Burrow assisted him in pulling Watson from the vehicle. (Clements Tr. 55-56.) Burrow was not asked about Clements' statement. Because the Court concludes that it was reasonable under the circumstance to pull Watson out of his vehicle, it is unnecessary to resolve whether Burrow did, in fact, assist Clements in doing so.

was unsuccessful because of Watson's physical resistance. (Clements Tr. 175-76.)

12. Because Watson refused to obey verbal commands to place his hands behind his back and continued to physically resist the officers' attempts to handcuff him, Office Burrow sprayed a one-second burst of Freeze+P in the direction of Watson's face. (Clements Tr. 61, 62, 175; Burrow Tr. 25, 240-41.)

13. The burst of Freeze+P applied by Officer Burrow helped the officers get Watson to the ground. The officers attempted to handcuff Watson while still trying to get him to spit out the marijuana. Watson pulled away from the officers and appeared to be attempting to swallow the drugs in his mouth. (Burrow Tr. 25-27; Clements Tr. 61-63, 176-77.)

14. While struggling with Watson on the ground, Officer Clements applied a one-second burst of Freeze+P toward Watson's face in an effort to subdue him and cause him to eject the marijuana from his mouth. (Burrow Tr. 27; Clements Tr. 63, 176.)

15. After Officer Clements applied the burst of Freeze+P, Watson stopped resisting. Officer Burrow was able to handcuff Watson, and he spit out the bag of marijuana in his mouth. (Burrow Tr. 27, 240-41; Clements Tr. 63, 176-77, 180.)

16. No force was used against Watson after he was handcuffed. (Burrow Tr. 27, 240-41; Clements Tr. 176-77; *see also* Watson Tr. 109-10 (at his deposition, Watson testified that he was sprayed after being handcuffed on October 13, 2007, not on February 20, 2008).)

17.   Although Watson's version of the events of February 20, 2008, differed substantially from that of Officers Burrow and Clements, the Court finds the testimony of the officers more credible than that of Watson. The Court does not credit Watson's testimony that he voluntarily stepped out of his vehicle, held up his hands, and stated that he was not resisting. Watson's direct testimony and prior statements do not mention that he had marijuana in his mouth, a fact that he acknowledged on cross examination. Watson has difficulty retrieving memories because of an unrelated gunshot injury. (Watson Tr. 114-16; *see also* Tr. 11-12 (Watson's opening statement).) The Court credits the officers' testimony that they did not place their knees on Watson's neck. (Burrow Tr. 259; Clements Tr. 65-66, 184-85.)

18.   After Plaintiff had been handcuffed, he was provided water to flush out his eyes. (Burrow Tr. 246; Clements Tr. 178.) He was transported to the police station for booking, at which time he was given wipes to clean off the spray. (Burrow Tr. 246; Clements Tr. 178.) Plaintiff did not complain about any injuries other than the effects of the spray on his eyes. (Burrow Tr. 246; Clements Tr. 181.)

19.   Watson was charged with possession of marijuana, resisting arrest, driving on a suspended or revoked license, and tampering with evidence. The charge of tampering with evidence was a felony. (Watson Tr. 91; Burrow Tr. 241; Clements Tr. 178.)

20. Watson pled guilty to the charge of simple possession of marijuana arising from his arrest on February 20, 2008. (Watson Tr. 96; Trial Ex. 2.)

21. The officers acted in accordance with the DPD's use of force policy and the use of force continuum on which they had been trained. (Trial Ex. 10 & 11; Burrow Tr. 219-21, 238-40; Clements Tr. 161-67, 174, 176, 179-80; Mays Tr. 284-85.)

## III.    CONCLUSIONS OF LAW

To state a claim under 42 U.S.C. § 1983,[21] a plaintiff must allege two elements: (1) a deprivation of rights secured by the "Constitution and laws" of the United States (2) committed by a defendant acting under color of state law. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 150, 90 S. Ct. 1598, 1604, 26 L. Ed. 2d 142 (1970). Defendants Burrow and Clements acted under color of state law during the events at issue.

Plaintiff's claim that Defendants Burrow and Clements used excessive force in arresting him on February 20, 2008, arises under the Fourth Amendment. <u>Graham v. Connor</u>, 490 U.S. 386, 394, 109 S.

---

[21]    Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989).[22] Not every use of force in making an arrest will state a § 1983 claim. "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396, 109 S. Ct. at 1872. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id., 109 S. Ct. at 1872. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S. Ct. at 1872. The "reasonableness" inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397, 109 S. Ct. at 1872. The proper application of this standard "requires careful attention to the

---

[22] In its order on summary judgment, the Court dismissed Plaintiff's claim for false arrest, which was limited to a challenge to a custodial arrest for a misdemeanor. (See D.E. 137 at 9 n.8, 23 n.10.) Although Plaintiff now claims that the officers lacked reasonable suspicion for the traffic stop (D.E. 185-1 at 1), it is unnecessary to address that assertion at length. Pursuant to Terry v. Ohio, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884-85, 20 L. Ed. 2d 889 (1968), a police officer is permitted to make a brief investigatory stop when he has a reasonable suspicion that criminal activity may be afoot. An officer's reasonable suspicion must be supported by "specific and articulable facts." Id. at 21, 88 S. Ct. at 1880; see also Ill. v. Wardlow, 528 U.S. 119, 123-24, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000) ("The officer must be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity.") (additional internal quotation marks & citation omitted). In this case, the officers had reasonable suspicion for a Terry stop because Officer Burrow had run Watson's license the previous week and found that it had been revoked. (Burrow Tr. 19-20.)

facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396, 109 S. Ct. at 1872; *see also* Martin v. City of Broadview Heights, 712 F.3d 951, 958 (6th Cir. 2013) (same); Baker v. City of Hamilton, Ohio, 471 F.3d 601, 606 (6th Cir. 2006) (same). "These factors are not an exhaustive list, as the ultimate inquiry is whether the totality of the circumstances justifies a particular sort of seizure." Baker, 471 F.3d at 606-07 (internal quotation marks and citations omitted).

That an arrestee does not suffer physical injuries does not establish that there has been no Fourth Amendment violation. "In determining whether there has been a violation of the Fourth Amendment, [a court must] consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." Miller v. Sanilac Cnty., 606 F.3d 240, 252 (6th Cir. 2010) (internal quotation marks and citation omitted); *see also* Stricker v. Twp. of Cambridge, 710 F.3d 350, 364 (6th Cir. 2013) ("In general, a plaintiff need not demonstrate a physical injury."); Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 511 (6th Cir. 2012) (applying standard where taser shock might have contributed to suspect's death); Morrison v. Bd. of Trs. of Green Twp., 583 F.3d 394, 407 (6th Cir. 2009) ("'Gratuitous violence' inflicted upon an incapacitated detainee constitutes an excessive

use of force, even when the injuries suffered are not substantial.").[23]

Applying these factors to the instant case, the officers stopped Watson because they suspected him of driving on a suspended or revoked license, which is a misdemeanor in the State of Tennessee. Tenn. Code Ann. § 55-50-504(a)-(b). After Officer Clements approached the vehicle, he had probable cause to arrest Plaintiff for possession of marijuana, a misdemeanor, and tampering with evidence, a Class E felony. Those offenses are "moderate in severity." Gaddis ex rel. Gaddis v. Redford Twp., 364 F.3d 763, 774 (6th Cir. 2004) (misdemeanor DUI and fleeing an officer); see also Williams v. Sandel, 433 F. App'x 353, 360-61 (6th Cir. 2011) (naked man walking along highway might have violated various state laws), cert. denied, ___ U.S. ___, 132 S. Ct. 1622, 182 L. Ed. 2d 163 (2012). In this case, "[t]he amount of force [the officers] used, although not trivial, was [also] moderate." Gaddis ex rel. Gaddis, 364 F.3d at 774.

"Of course, the use of force can be reasonable, even when the crime at issue is innocuous." Thomas v. Plummer, 489 F. App'x 116, 126 (6th Cir. 2012); see also Turner v. City of Toledo, No. 3:07 CV 274, 2012 WL 1669836, at *8 (N.D. Ohio May 14, 2012) ("Turner's initially minor crime does not abrogate his failure to comply with,

---

[23] For example, "[a]n officer has used excessive force when he pepper sprays a suspect who has not been told she is under arrest or is not resisting arrest." Grawey v. Drury, 567 F.3d 302, 311 (6th Cir. 2009). Use of an excessive amount of pepper spray might violate the Fourth Amendment. Id. at 312 (use of enough pepper spray to cause suspect to pass out). Those circumstances were not present in the instant case.

and his physical resistance to," the officers); <u>Edwards v. City of Martins Ferry</u>, 554 F. Supp. 2d 797, 806 (S.D. Ohio 2008) (granting summary judgment on claim that taser was used on elderly suspect with Alzheimer's disease accused of urinating in city park, and stating, "While the severity of the crime is not a factor in this case, it was reasonable for Officer Dojack to believe that Mr. Edwards could pose a threat in that he was resisting arrest.").

The two remaining <u>Graham</u> factors establish that the officers' use of force in effecting Plaintiff's arrest on February 20, 2008 was reasonable under the circumstances. The testimony at trial demonstrated that the officers were reasonably concerned that Plaintiff might pose a risk to them and to himself. The officers had actual knowledge that Plaintiff had previously been found in the vicinity of a firearm and, therefore, they were alert to the risk that he might have a weapon in his vehicle. (Factual Finding ("FF") 10.) Plaintiff was attempting to swallow a plastic baggie containing marijuana, leading the officers to fear that he might be injured by choking on the baggie or by ingesting a harmful substance that might be found in the marijuana. (FF 5.) By swallowing the marijuana, Plaintiff was also destroying evidence of a crime. Under those circumstances, the officers acted reasonably in pulling Plaintiff out of his vehicle when he disregarded Officer Clements' verbal instructions to get out of the car and spit out the drugs.

Once Plaintiff was on his feet, the officers acted reasonably under the circumstances by spraying him with two bursts of Freeze+P

to get him on the ground, handcuff him, and make him spit out the contents of his mouth. *See, e.g.,* <u>Williams</u>, 433 F. App'x at 362 (use of baton strikes, pepper spray, and taser on naked man who was actively resisting arrest on highway not unreasonable); <u>Abdul-Khaliq v. City of Newark</u>, 275 F. App'x 517, 521 (6th Cir. 2008) (affirming summary judgment on excessive force claim where officers had probable cause to arrest suspect for disorderly conduct and suspect "suffered a brief dose of pepper spray, was knocked to the ground, and was handcuffed" after "carrying on a prolonged and heated debate about whether or not he had a gun, and vigorously opening his coat in a gesture toward the police officers"); <u>Cabaniss v. City of Riverside</u>, 231 F. App'x 407, 413 (6th Cir. 2007) (affirming summary judgment on excessive force claim where unsecured suspect in back of patrol car was sprayed with pepper spray after disregarding orders to stop repeatedly banging head on partition and officers had information that suspect might be suicidal).

This conclusion is not altered by Watson's claim that Clements used a racial slur during the encounter. <u>Williams</u>, 433 F. App'x at 362 (collecting cases); <u>McDougald v. Timberlake</u>, No. 1:08-cv-744, 2010 WL 2572800, at *3 (S.D. Ohio May 27, 2010) ("An officer's alleged use of slurs and racial epithets is not a search or seizure, and thus cannot sink to the level of violating the Fourth Amendment's prohibition of excessive force.") (report and recommendation), *adopted*, 2010 WL 2572752 (S.D. Ohio June 21, 2010); <u>Uhuru v. City of Memphis</u>, No. 08-2150-V, 2009 WL 3255194, at

*12 (W.D. Tenn. Oct. 6, 2009) ("The Uhurus allege that Lt. McCord used racial slurs in referring to the Ururus as well as their daughter. But to find a violation under the Fourth Amendment, there must first exist a search or seizure. The use of racially insensitive language does not constitute a search or seizure and therefore does not amount to a constitutional violation.") (citation omitted). As previously stated, *see supra* p. 74, an officer's subjective feelings are not relevant to whether his conduct was objectively reasonable under the circumstances.

The officers used no more force than was reasonably necessary to subdue and restrain Watson, cause him to spit out the marijuana, and place him under arrest. Therefore, the Court HOLDS that Officers Burrow and Clements did not use excessive force against Plaintiff on February 20, 2008.

"Governmental officials performing discretionary functions generally are shielded from liability for civil damages in so far as their conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). "Determinations of qualified immunity require [a court] to answer two questions: first, whether the officer violated a constitutional right; and second, whether that right was clearly established in light of the specific context of the case." Hayden v. Green, 640 F.3d 150, 153 (6th Cir. 2011), *cert. denied,* ___ U.S. ___, 132 S. Ct. 543, 181 L. Ed. 2d 349 (2011). Those questions may be addressed in any order. Id. Because

the Court has concluded that Officers Burrow and Clement did not violate Plaintiff's Fourth Amendment rights, it necessary follows that they are entitled to qualified immunity.

Because Plaintiff has failed to prove his claims against Defendants Burrow and Clements arising from the events of February 20, 2008, a verdict must be rendered for Defendants, for which let judgment issue.[24]

## IV.    APPELLATE ISSUES

The Court must also consider whether Plaintiff should be allowed to appeal this decision *in forma pauperis*, should he seek to do so. When an appellant seeks to proceed *in forma pauperis* on appeal, the United States Court of Appeals for the Sixth Circuit requires that all district courts in the circuit determine whether the appeal would be frivolous. Twenty-eight U.S.C. § 1915(a)(3) provides that "[a]n appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith."

The good faith standard is an objective one. <u>Coppedge v. United States</u>, 369 U.S. 438, 445, 82 S. Ct. 917, 921, 8 L. Ed. 2d 21 (1962). The test under 28 U.S.C. § 1915(a) for whether an appeal is taken in good faith is whether the litigant seeks appellate review of any issue that is not frivolous. <u>Id.</u> The considerations that lead the Court to grant summary judgment on some of Plaintiff's claims and to grant judgment for Defendants on the

---

[24]    Plaintiff's remaining claims were resolved by summary judgment. (*See* D.E. 137.)

remaining claims also compel the conclusion that an appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith and Plaintiff may not proceed on appeal *in forma pauperis*. Leave to proceed on appeal *in forma pauperis* is, therefore, DENIED.

If Plaintiff appeals the dismissal of this case, the Court is required to assess the $455 appellate filing fee. In <u>McGore v. Wrigglesworth</u>, 114 F.3d 601, 610-11 (6th Cir. 1997) (per curiam), *partially overruled on other grounds*, <u>LaFountain v. Harry</u>, 716 F.3d 944, 951 (6th Cir. 2013), the Sixth Circuit set out specific procedures for implementing the Prison Litigation Reform Act of 1996, 28 U.S.C. §§ 1915(a)-(b). Plaintiff is instructed that, if he wishes to take advantage of the installment procedures for paying the appellate filing fee, he must comply with the procedures set out in <u>McGore</u> and 28 U.S.C. § 1915(b).

IT IS SO ORDERED this 20th day of September, 2013.


*s/  Samuel H. Mays, Jr.*
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE